# EXHIBIT A

## UNITED STATES DISTRICT COURT

## THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| MANGO LABS, LLC, a Wyoming limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>JOHN KRAMER, an individual, MAXIMILIAN SCHNEIDER, an individual, and Does 1-10, et al.,<br><br>      Defendants. | CIVIL ACTION NO.: 3:24-cv-01469-GMM<br><br>**DECLARATION OF DAFYDD DURAIRAJ IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT JOHN KRAMER'S MOTION TO DISMISS** |

I, Dafydd Durairaj, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America as follows:

I am the principal of Defendant Mango Labs, LLC ("Mango Labs"), and I make this declaration in support of Mango Labs' Opposition to Defendant John Kramer's Motion to Dismiss. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration and if asked to testify as to these facts, I would be competent to do so.

**A.      Mango Markets Launched in 2021.**

1.      I founded Mango Markets in 2021.   Defendant Maximilian Schneider ("Schneider") was also involved in the founding.  Tyler Shipe ("Shipe") was part of the founding team and the first contributor to Mango Markets.  Mango Markets is a decentralized finance protocol.  Through the Mango Markets protocol, people are able to borrow, lend, and trade cryptocurrency and cryptocurrency derivatives.  Mango Markets experienced rapid growth. Mango Markets tokens are MNGO.

2.    The organization that governs the Mango Markets protocol is the Mango DAO.

3.    The Mango DAO has certain members that take on trusted roles akin to partners with fiduciary duties.  MNGO token holders can make governance decisions about the protocol by voting with their tokens.  Mango Labs is an entity that has been funded by the Mango DAO to develop software for Mango Markets and to manage Mango DAO's legal claims, including victims' claims against Avraham Eisenberg ("Eisenberg"), the DAO's claims against Kramer and Schneider, and others.  I am the owner of Mango Labs.

4.    Kramer joined the DAO in a trusted senior position after its founding.  He became the treasurer of the Mango DAO, and, along with Schneider took on significant roles within the Mango DAO, comparable to those conducted by officers and partners.  Shipe and I have had significant roles in the Mango DAO since its founding and accomplished critically important matters for the DAO, including helping the DAO recover $67,000,000 in stolen funds and resolving multiple civil and regulatory matters in the DAO's best interests.

**B.    In 2022, Mango Markets Suffered a $114,000,000 Criminal Exploit that the DAO, with the help of Shipe and Me, Resolved by Making all Depositor Victims Whole.**

5.    In October 2022, an individual named Avraham Eisenberg illegally exploited Mango Markets.  Eisenberg, through fraud and deception, converted approximately $114 million from Mango Markets depositors into his own accounts. Through Shipe's and my leadership, the DAO recovered $67,000,000 of the misappropriated digital assets and used the DAO's treasury to supplement such that all MNGO holders were made whole within weeks of the attack.

6.    Those victims and the DAO voted to assign their claims against Eisenberg to Mango Labs, and Mango Labs sued Eisenberg on behalf of his victims in the Southern District of New York.  Attached as **Exhibit 1** is a true and correct copy of a decision in *Mango Labs, LLC, v. Avraham Eisenberg*, Case No.: 23 Civ. 665, in the United States District Court, Southern District

2

of New York, dated March 10, 2023.  Attached as **Exhibit 2** is a true and correct copy of an excerpt

of a transcript in the criminal case against Eisenberg, *USA v. Eisenberg*, Case No.: 1:23-cr-00010-

AS.

7.      In December 2022, the United States Attorney's Office for the Southern District of

New York filed a criminal complaint against Eisenberg based on his actions against Mango

Markets.  I, through my role as the owner of Mango Labs, and Shipe, both as witnesses and victims,

were heavily involved in the action against Eisenberg and sought to manage the fallout from

Eisenberg's crime.

8.      Mango Labs' civil complaint was stayed pending Eisenberg's criminal case.  The

criminal case went to trial in April 2024, where a jury convicted Eisenberg of fraud, commodities

market manipulation, and wire fraud.

9.      Eisenberg's attack on Mango Markets spawned charges against him by the United

States Securities and Exchange Commission ("SEC"), as well as by the Commodity Futures

Trading Commission ("CFTC").  Eisenberg's attack on Mango Markets also led to an SEC

investigation of Mango Markets itself, including the Mango DAO.

10.      Mango Labs, Shipe, and I shouldered the primary burden of handling the SEC

investigation for the DAO's benefit.  The DAO funded Mango Labs to lead the charge on its legal

matters.  When Kramer and Schneider threatened to block funding for Mango Labs because that

would make it easier to get away with their fraud, Mango Labs continued its work despite

uncertainty about funding.  Shipe and I also both participated in proffers to the DOJ, SEC, and

CFTC, saving Schneider and other DAO members the need to do so.  I introduced a proposal for

Labs to settle with the SEC, which led to a consent judgment in the Southern District of New York.[1] Attached as **Exhibit 3** is a true and correct copy of the proposal.

11.     After diligent work, Mango Labs negotiated a favorable settlement with the SEC on behalf of a joint defense group that included the Mango DAO—which benefited Kramer as well.  Mango Labs also negotiated a favorable settlement with the CFTC that the DAO approved[2], which is currently pending.

12.     At no point during any of the work Shipe and I did to help the DAO deal with its legal issues did we take any salary or payment of any kind for our efforts to help the DAO handle multiple legal matters.

**C.     Kramer and Schneider Attacked the Mango DAO in Its Weakened State.**

13.      While Shipe and I were handling the DAO's legal matters, Kramer and Schneider conspired to take advantage of the DAO in its vulnerable state.   In November 2022, FTX, a cryptocurrency exchange filed for bankruptcy. Prior to its collapse, FTX allowed its users to deposit MNGO. The bankruptcy estate assumed control of the MNGO.   In October 2023, the bankruptcy court ordered the FTX estate to sell certain assets, including the MNGO tokens.

14.     Kramer and Schneider, in their trusted positions within the DAO, represented to the DAO and its members that they were going to buy back the MNGO tokens from the FTX estate and transfer them close to cost to the DAO.  This, of course, would benefit the DAO and MNGO token holders.  After the Eisenberg attack, the DAO wished to recover FTX's MNGO tokens itself.

---

[1]

https://app.realms.today/dao/MNGO/proposal/9Ex2wAACZ928p5kMHUQcgruivFvKXZRichiu Dy9iVgsL.

[2]

https://dao.mango.markets/dao/MNGO/proposal/35uJRJBQ64zQ82N4x32km9vRnDtvpJ5jF3Mf wfzBoXvL

ACTIVE 707049315v2

This was preferable to having them fall into the hands of a malicious actor who could abuse the tokens' voting power to steal from the DAO.

15.    But Kramer and Schneider instead conspired to buy the tokens for themselves while hiding their identities from the DAO. Upon information and belief, they purchased approximately 330 million MNGO that had been held by the FTX estate. They then—just hours before the end of voting—anonymously deposited all 330 million tokens into the Mango DAO,[3] thereby giving themselves more voting power, which they used to pass a proposal for Mango DAO to buy the tokens at an artificially inflated price.

16.    Although Mango Labs and members of the Mango DAO have tried to convince Kramer and Schneider to transfer the tokens to the DAO at cost as they represented they would do, and as their fiduciary duties to the DAO required them to do, they have refused to do so. Instead, they have tried to intimidate DAO members, including members of the Council, with threats. They have also attempted to block the DAO's funding for Mango Labs' efforts to pursue the legal claims against Eisenberg and handle other legal matters for the DAO.

17.    Adrian Brzeziński issued a proposal to appoint a DAO representative for the narrow purpose of signing on behalf of the DAO for the SEC settlement.[4] Attached as **Exhibit 4** is a true and correct copy of the proposal.

**E.    Mango Labs Filed Its Original Action Against Kramer And Schneider.**

---

[3] Mango DAO members were suspicious about the deposited tokens. (Compl. at ¶ 9.) Nevertheless, the DAO purchased 72.8 million MNGO tokens under the proposal. (*Id.* at ¶ 13.) Attached as **Exhibit 5** is a true and correct copy of the Solscan page, available at https://solscan.io/tx/4KcwMmoNLtmHNX9si3D3DapeiuXAmeiJhrQBQQM6iiDBXWUzpKTN x5PY4Y7sC3HTmapwWnWsHYgd1ZEXfvDSrMw7.

[4] https://app.realms.today/dao/MNGO/proposal/67fLnjf928GUm6ou8pTxh58WKxQyVXpd2YhX jceeciBM.

18.     The Mango DAO and certain DAO members, including myself and Shipe, voted to assign our claims against Kramer and Schneider to Mango Labs, which was consistent with how the DAO handled legal claims in the past (e.g., against Eisenberg).  I initiated a public discussion regarding Kramer's and Schneider's conduct on the Mango DAO's Discord channel and X before Mango Labs filed the complaint.  Attached as **Exhibit 6** is a true and correct copy of a Discord post.  Attached as **Exhibit 7** is a true and correct copy of a post on X.

19.     I proposed the following "Assignment of Claims from Mango DAO and Its Members to Mango Labs, LLC:

> The Mango Decentralized Autonomous Organization and its individual members ("Mango DAO"), hereby transfers their rights and claims against Maximillian Schneider and John Kramer arising from and related to their fraud and misrepresentation regarding the MNGO tokens they purchased from FTX.  Mango DAO also transfers all rights, claims, and defenses against any third parties whose conduct, whether by negligence or otherwise, enabled the harm caused by Kramer and Schneider.  Mango DAO and Mango Labs, LLC agree that Mango Labs will provide services to Mango DAO to enforce the assigned claims as necessary through legal action in applicable jurisdictions. Upon recovery of assets, Mango Labs will return proceeds, after reasonable costs and fees, to Mango DAO.  Mango DAO agrees to reimburse and indemnify Mango Labs, LLC and its officers for any reasonable costs and claims relating to this action.  Through this agreement, Mango DAO hereby irrevocably conveys, transfers and assigns to Mango Labs, LLC all rights, titles, and interests in, to and under all claims arising out of or related to the dispute. These include, without limitation, all causes of action or other rights with respect to such claims, all rights to receive any amounts or property or other distribution in respect of or in connection with such claims, and any and all proceeds of any of the foregoing (including proceeds of proceeds).  This release constitutes an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law.  By passage of the vote, Mango DAO manifests assent and agreement to be bound by this assignment.

Attached as **Exhibit 8** is a true and correct copy of the proposal.[5]

---

[5]

https://app.realms.today/dao/MNGO/proposal/Chmsfrpt9oKWoug5ebyaik89y19xynbmPeWFam
EEBCUV.  Attached as **Exhibit 9** is a true and correct copy of a notification regarding the vote on X, available at  https://x.com/dadadadaffy/status/1839329895312425156.

20.     Eighteen individual wallets (which included my wallets) voted to assign their

claims.  Below is a true and correct chart of data I compiled based on a review of public blockchain

records regarding the assignments:

| Proposal Name | Assign Fraud Claims to Mango Labs | |
|---|---|---|
| | | |
| Proposal Address | Chmsfrpt9oKWoug5ebyaik89y19xynbmPe WFamEEBCUV | |
| | | |
| Total Voters | 27 | |
| | | |
| Voter Address | Vote Type | Votes Cast |
| MNGk1NGUR1G4Mp************************************* | No | 280,811,520.48 |
| 2CCTKAY6AVctbfDrU************************************* | Yes | 182,506,317.26 |
| ABMq72gjwMcr19GB************************************* | Yes | 100,000,000.00 |
| 3LPh9LN88kxSe3shx************************************* | No | 80,000,000.00 |
| E4T8FGCqqChSNXJg76************************************* | Yes | 60,000,000.00 |
| 2EMMzD6YZxLPQ4J8L************************************* | Yes | 50,000,000.00 |
| RLMq1FgFbUVtyxui3RV************************************* | No | 32,026,876.51 |
| HsZD1e3XD4YDBhza************************************* | Yes | 31,770,439.00 |
| 5wZ6N7cDCocEskFdW************************************* | No | 27,707,900.35 |
| 5DGbogKUo8haEYC9************************************* | No | 13,442,883.15 |
| 2zjSPFjo4YkTSn3We************************************* | No | 11,000,000.00 |
| J559co8aY4xzYBiWiG************************************* | No | 10,000,000.00 |
| EHkdvykGvvAHAWt5************************************* | Yes | 7,640,468.26 |
| DaffYGVhYqYmp84qsPrc************************************* | Yes | 5,240,614.42 |
| 7bqM8DahM5YBCA25************************************* | Yes | 3,639,135.11 |
| 8yyCjWx1bYGgX9UisY************************************* | Yes | 2,058,464.11 |
| AMMS71iywhGZJ3Hd************************************* | Yes | 1,794,737.52 |
| G1KPcfXYNu5uW8kdRB************************************* | Yes | 1,049,588.63 |
| J5qQkzVQqYcibwRanf************************************* | Yes | 531,900.89 |
| 2Gd9gcPBzemojGVRUY************************************* | Yes | 118,976.79 |
| 3Pyn29pPC7snh5uXc5x************************************* | Yes | 101,237.01 |
| FAStYaMFHyqWzZwQJE************************************* | No | 73,739.38 |
| 5yQTceb1MsLHLnGdxs29************************************* | No | 35,824.38 |
| Ai5mecszgv7YdRBnD1Zu************************************* | Yes | 31,125.75 |
| 4MfXJi2D6uFcVrS2kWVzBB************************************* | Yes | 19,307.58 |
| 2X6V6bGsdkMy65CixrTat************************************* | Yes | 66.82217 |
| Bsa2Up3KQyGMzi7tHYT7************************************* | Yes | 10 |

21.     I am included in the above chart as a yes voter and did choose to assign my own

claims against Defendants to Mango Labs.  The raw addresses (consisting of numbers and letters)

may either be unique individuals, or they may be side wallets of one of the confirmed individuals—

it is not possible to tell without doing complex, on-chain and other investigation analyses.  It

7

appears based on my review of on-chain records and my personal knowledge that five confirmed individuals voted for assignment and four confirmed individuals voted against assignment (again, the raw addresses may be side wallets of one of the confirmed individuals).  Of the 455 million total nay votes, approximately 72% came from Kramer, 22% from Schneider, 6% from Adrian Brzeziński.  Defendants' nay votes comprised 94% of the votes against the assignment of claims against them.  Without their fraudulently obtained tokens (280.8 million votes at the time), Defendants would not have been able to defeat the vote.  Therefore, the majority of the valid votes voted to assign the claims against Defendants to Mango Labs.

22.     If the Court has any question about the validity and logistics of the assignment, I would be happy to execute another assignment of my own claims, and would also vote in favor of assigning the DAO's claims.

23.     On October 7, 2024, Mango Labs filed its Complaint against Kramer and Schneider alleging that they improperly misappropriated their positions as trusted Mango DAO members to purchase the FTX MNGO tokens at issue for their own benefit.  I was a member of the DAO and the owner of Mango Labs at the time Mango Labs filed the Complaint.  Given my ownership of Mango tokens and my position within the DAO, I have been significantly injured by Defendants' actions against the DAO and against me.

24.     To my knowledge, there is nobody important to Mango Labs' action who is a citizen of Puerto Rico other than Kramer.  None of the assignors are Puerto Rico citizens.  I am not aware of any senior member of the DAO with significant trusted duties or operational roles who resides in Puerto Rico, other than Kramer.  I am a resident and citizen of North Carolina.

Executed on this 11th day of February, 2025, in New York, New York.

Respectfully submitted,



**Dafydd Durairaj**

# EXHIBIT 1

N3ABLABD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MANGO LABS, LLC,,

               Plaintiff,

          v.                          23 Civ. 665 (LJL)

AVRAHAM EISENBERG,

               Defendant.
                                      Decision
------------------------------x
                                      New York, N.Y.
                                      March 10, 2023
                                      10:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                      District Judge


                         APPEARANCES

MORRISON & FOERSTER, LLP
     Attorneys for Plaintiff
BY:  JOSEPH A. LAWRENCE
     MICHAEL BURSHTEYN


TARTER KRINSKY & DROGIN, LLP
     Attorneys for Defendant
BY:  MARK BERKOWITZ
     RICHARD J. LOMUSCIO

N3ABLABD

1          (Case called; appearances noted)

2          THE COURT:  Good morning.  All right.  I'm prepared to

3    give you my decision, which I will do orally.

4          Plaintiff moves for a preliminary injunction enjoining

5    the Defendant (as well as Defendant's agents, servants,

6    employees, attorneys, and other persons who are in active

7    concert or participation with defendant, his agents, servants,

8    employees, and attorneys) during the pendency of this action

9    from selling, liquidating, transferring, pledging, or otherwise

10   encumbering the $47 million dollars' worth of digital assets

11   that defendant allegedly converted from Mango Markets

12   hereafter, the "Requested Preliminary Injunction" dkt. No. 6.

13   A temporary restraining order enjoining defendant, his agents,

14   servants, employees, and attorneys from selling, liquidating,

15   transferring, pledging, or otherwise encumbering these assets

16   is currently in effect against defendant and expires today.

17   Dkt. No. 27.

18          The complaint in this action was filed by Plaintiff

19   against defendant on January 25, 2023.  Dkt. No. 1.  The

20   allegations in the Complaint stem from an alleged October 11,

21   2022 attack by the Defendant on Mango Markets, in which he

22   manipulated the value of the Mango (MNGO) token, and through

23   fraud and deception converted approximately $114 million of the

24   funds of Mango Market depositors into his own accounts.  Id.

25   paragraph 3.  Defendant then, pursuant to a settlement

N3ABLABD

agreement with Mango Decentralized Autonomous Organization

("Mango DAO"), returned approximately $67 million of the money

he converted to depositors (the "Settlement Agreement").  Id.

paragraph 4.  He currently retains the remaining $47 million he

allegedly unlawfully converted.  Id.

         After the incident at issue, Mango Markets depositors

who lost assets as a result of defendant's alleged attack

agreed to assign over 90% of their claims to Plaintiff.  Id.

paragraph 52.  In return for assigning their claims, Mango DAO

provided depositors the amount of remaining funds that they

lost from defendant's alleged attack, which were paid from the

Mango DAO insurance fund.  Id.  paragraphs 48-49.

         The complaint alleges four causes of action against

the Defendant.  Id.  paragraphs 59-88.  The first cause of

action is for conversion based on defendant allegedly

improperly converting cryptocurrency from Mango Markets'

depositors to the exclusion of their rights as rightful owners.

Id.  paragraphs 59-65.  The second cause of action is for

fraudulent misrepresentation based on allegations that

defendant made a series of false representations to Mango

Markets depositors that they relied on, which enabled him to

get away with his unlawful acts.  Id.  paragraphs 66-74.  The

third cause of action is for unjust enrichment.  Id.

paragraphs 75-81.  The fourth cause of action is for a

declaratory judgment that the settlement agreement entered into

N3ABLABD

1    between Defendant and the Mango DAO was procured under duress.

2    Id.  paragraphs 82-88.

3          The U.S. Attorney's Office for the Southern District

4    of New York filed a criminal complaint against defendant

5    related to the same conduct at issue in this lawsuit, and

6    defendant is currently detailed pending trial in New York.  Id.

7    paragraphs 5.  The indictment filed against Defendant provides:

8    As a result of committing the offense alleged in Count Three of

9    this Indictment, Avraham Eisenberg, the defendant, shall

10   forfeit to the United States, pursuant to Title 18, United

11   States Code, Section 981(a)(1)(C) and Title 28 United States

12   Code, Section 2461(c), any and all property, real and personal,

13   that constitutes or is derived from proceeds traceable to the

14   commission of said offense, including but not limited to a sum

15   of money in United States currency representing the amount of

16   proceeds traceable to the commission of said offense.

17         That's Case No. 23-cr-00010, Dkt. No. 4, paragraph 28.

18   The indictment also contains a forfeiture allegation which

19   provides that if any of the forfeitable property cannot be

20   located or has been transferred or sold to a third person,

21   placed beyond the jurisdiction of the Court, or substantially

22   diminished in value, it is the intent of the United States to

23   seek forfeiture of any other property of the defendant up to

24   the value of the above forfeitable property.  Id.  Paragraph

25   29.  Defendant is also being sued by the Commodities Futures

N3ABLABD

Trading Commission and the Securities and Exchange Commission

in two separate civil actions related to the conduct at issue

in this lawsuit.  Dkt. No. 1, paragraph 5.

On the same date that the plaintiff filed its

complaint in this action, plaintiff moved for a temporary

restraining order and a preliminary injunction.  Dkt. No. 7.

The Court held a hearing on this request on January 30, 2023.

Neither defendant nor counsel for defendant appeared at the

hearing.  Following the conference, the Court entered a

temporary restraining order enjoining defendant, his agents,

servants, employees, attorneys, and other persons who are in

active concert or participation with defendant, his agents,

servants, employees, and attorneys from selling, liquidating,

transferring, pledging, or otherwise encumbering the assets.

Dkt. No. 27 at 2.

The Court also ordered the defendant to show cause

before the Court on February 10, 2023 why an order should not

be issued pursuant to Rule 65 of the Federal Rules of Civil

Procedure entering the requested preliminary injunction. The

Court also ordered plaintiff to serve defendant or his counsel

by email and overnight mail on or before February 1, 2023, and

to endeavor to make personal service on the defendant upon his

arrival in the Southern District of New York.  The Court

further ordered plaintiff to serve a copy of the order along

with relevant papers on the assistant U.S. attorneys in the

N3ABLABD

1   criminal case against defendant by February 1, 2023.

2        Counsel appeared in this action on behalf of defendant

3   on February 9, 2023.  Dkt. Nos. 28-29.  On the same day,

4   defendant filed a letter requesting an adjournment of the show

5   cause hearing scheduled for February 10, 2023, and noted that

6   plaintiff did not oppose the request.  Dkt. 30.  Defendant also

7   consented to an extension of the temporary restraining order

8   until the show cause hearing was held. The Court approved the

9   request on February 9, 2023, and set the show cause hearing for

10   February 24, 2023.  Dkt. No. 31.  Defendant filed a memorandum

11   of law and declaration in opposition to the request for a

12   preliminary injunction on February 15, 2023.  Dkt. Nos. 35-36.

13   On February 22, 2023, Plaintiff filed a reply memorandum of law

14   and declaration in support.  Dkt. Nos. 37-38.

15        The Court held the show cause hearing on February 24,

16   2023.  Plaintiff notified the Court that it had provided notice

17   of the proceeding to the U.S. Attorney's Office and the U.S.

18   Attorney's Office chose not to intervene and did not express a

19   position on the request.  At that conference, the parties

20   agreed to an extension of the temporary restraining order

21   previously entered by the Court until the date of the present

22   conference.

23        Let me now discuss the request for the injunction.

24   I'm going to start with standing.

25        In addressing the merits of whether the Proposed

N3ABLABD

Preliminary Injunction should issue, the Court first rejects

Defendant's argument that Mango Labs has not offered evidence

that it has standing to file this suit.

"In general, claims or choses in action may be freely

transferred or assigned to others'; however, in order to make

that assignment valid, 'the owner must manifest an intention to

make the assignee the owner of the claim." *Sonterra Cap.*

*Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257,

262-63 (S.D.N.Y. 2019) (quoting *Advanced Magnetics, Inc. v.*

*Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997)).

"Where a valid assignment has been executed, the assignee is

the real party in interest and the right to sue is exclusively

the assignee's."  Id. at 263.  Accordingly, an assignment of

claims allows the assignee to "stand in the place of the

injured party' and satisfy constitutional standing

requirements."  *Cortlandt St. Recovery Corp. v. Hellas*

*Telecommunications, S.a.r.*l, 790 F.3d 411, 418 (2d Cir. 2015)

(citation omitted).

In this case, plaintiff has made a sufficient showing

that it has standing as an assignee of the depositors' claims.

After defendant's alleged attack, Mango DAO presented

depositors with an agreement in which they agreed to "assign

[their] claims to Mango Labs LLC."  Dkt. Nos. 9-3 at 2.  A

declaration from Dafydd Durairaj, a founder at Mango Labs,

states that "depositors who lost assets as a result of

N3ABLABD

defendant's attack have agreed to assign over 90% of their

claims to Mango Labs to obtain the refund."  Dkt. No. 9 at 5.

Plaintiff thus has standing as the assignees of these

depositors' claims.

In reaching this conclusion, the Court rejects

defendant's argument that the settlement agreement between

Mango DAO and defendant purportedly releasing all claims

against defendant precludes the Court from finding that

plaintiff has standing.  In its fourth cause of action,

plaintiff seeks to have that settlement agreement declared

invalid.  If it is successful in obtaining that relief and on

its remaining causes of action, plaintiff will be entitled to a

monetary judgment against defendant for allegedly

misappropriating its depositors' remaining $47 million in

funds.  Standing in the place of the depositors, plaintiff thus

has demonstrated the existence of an injury in fact which a

favorable decision would redress.

The Court will now turn to the question of whether the

proposed preliminary injunction should be granted.

As a preliminary matter, the Court assumes that New

York law applies to questions of contract formation and

interpretation, as the parties apply New York law to these

questions in their briefs.  Dkt. No. 7 at 12-13; Dkt. No. 35 at

7; see *Pac. Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2

(S.D.N.Y. Sept. 14, 2022) ("The parties' briefs assume that New

N3ABLABD

York law controls, and such implied consent is sufficient to establish choice of law." (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (alterations in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

The party seeking a preliminary injunction bears the burden of demonstrating that the various factors justify relief.  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 441 (1974).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks and citation

N3ABLABD

omitted).  "To satisfy the irreparable harm requirement, {a

party} must demonstrate that absent a preliminary injunction it

will suffer an injury that is  neither remote nor speculative,

but actual and imminent, and one that cannot be remedied if a

court waits until the end of trial to resolve the harm."  Id.

(citations omitted).

          As to the first factor, the Court concludes that

plaintiff has not demonstrated a likelihood of success on the

merits.  Before plaintiff could obtain a judgment in its favor

on any of its three causes of action in its complaint,

plaintiff would need to obtain a judgment in its favor on its

fourth cause of action--that the settlement agreement between

defendant and Mango token holders is invalid.  That is because

in that Settlement Agreement (titled "Replay Bad Debt #2"), the

Mango token holders agreed to "waive any potential claims

against account holders with bad debt."  Dkt. No. 9  paragraph

12.  And, "under New York law, a valid release constitutes a

complete bar to an action on a claim which is the subject of

the release."  *Interpharm, Inc. v. Wells Fargo Bank, Nat.

Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro

Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952

N.E.2d 995, 1000 (N.Y. 2011)).

          Plaintiff argues that this settlement agreement is

invalid or otherwise does not bar its current claims against

defendant for a few reasons.  First, it argues that the

N3ABLABD

settlement agreement is unenforceable as it does not name the

defendant.  Dkt. No. 47 at 8.

The Court disagrees.  New York law does not require a

release to specifically name or identify the persons to be

discharged.  See *Wells v. Shearson Lehman/Am. Exp., Inc.*, 526

N.E.2d 8, 12 (N.Y. 1988).  Instead, the release need only

identify the parties with "reasonable certainty."  10 Williston

on Contracts § 29:8 (4th ed. May 2022 update); Restatement

Second of Contracts § 131 (1981) (noting that parties to a

contract need not be specifically named as long as they are

"reasonably identified").

Here, this requirement appears to be met.  The

settlement agreement is directed "to" the "controller of the

wallet" and then lists a specific wallet identification key.

Dkt. No. 9-2 at 3.  Plaintiff does not dispute that the

controller of that wallet is identifiable as the defendant.

Thus, the agreement appears to identify the defendant with

reasonable certainty, even if not by name.

Second, plaintiff argues that its current claims

against the defendant are not subject to the waiver in the

settlement agreement because the agreement does not waive

claims against the defendant, but merely waives "potential

claims against accounts with bad debt."  The phrase "bad debt,"

interpreted in the context of the broader agreement and the

events that led to the agreement appears to refer to the money

N3ABLABD

1  that defendant allegedly unlawfully obtained from Mango

2  depositors.  The title of the agreement is "Repay Bad Debt" and

3  details the assets/amounts of those assets the defendant has

4  "agreed to return."  Dkt. No. 9-2 at ECF p.3.

5       Thus, in agreeing to waive claims against accounts

6  with "bad debt," Mango token holders, at a minimum, appear to

7  have agreed to waive any claims against any accounts holding

8  the money that was allegedly unlawfully taken from Mango

9  Markets depositors.

10      Although it is true that plaintiff's current claims

11  are directly against the defendant and not any particular

12  "accounts," plaintiff's claims are indirectly against "accounts

13  with bad debt."  The purpose of the instant lawsuit is to

14  obtain a judgment which would entitle plaintiff to the $47

15  million the defendant allegedly misappropriated from its

16  depositors -- i.e., the "bad debt."  In fact, these are

17  precisely the assets that defendant seeks to freeze through a

18  preliminary injunction.  The Court therefore is not convinced

19  that this provision should be read so narrowly as not to apply

20  to plaintiff's claims. See *Atlas Partners, LLC v.*

21  *STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at *5

22  (S.D.N.Y. Aug. 10, 2015) ("a contract should not be interpreted

23  to produce a result that is absurd.") The Court also finds it

24  hard to believe that the parties intended for the agreement

25  only to waive claims against accounts and not the holders of

N3ABLABD

those accounts.

        Third, plaintiff argues that the settlement agreement
is invalid because it does not detail what claims are settled
and because the parties to the agreement did not "know the
extent of Defendant's fraud and all potential claims at the
time of the vote."  Dkt. No. 37 at 10.  But, under New York
law, a release need not list the specific claims that it
settles and may instead use broad language, as the settlement
agreement did here, waiving "all potential claims."  *Travelers*
*Home & Marine Ins. Co. v. Fiumara*, 82 N.Y.S.3d 502, 504 (2d
Dep't 2018).  Courts have held that such language waives not
only known but also unknown claims.  Id.  In addition, a
releasor need not be "subjectively aware" of the precise claim
he or she is releasing "at the time of execution of the
release" in order for the release of the claim to be valid.
*Mergler v. Crystal Properties Assocs., Ltd.*, 1583 N.Y.S. 2d
229, 232 (1st Dep't 1992).

        Fourth, plaintiff argues that the settlement
agreement, which was entered into between Mango token holders
and Defendant, cannot bar the claims of Mango Markets
depositors on whose behalf Plaintiff brings its current claims
and who did not vote in favor of the Settlement Agreement.  In
support of this argument, they also state that the class
depositors do not precisely overlap with the class of Mango
token holders.  Dkt. No. 46 at 1.  According to Plaintiff,

N3ABLABD

depositors hold accounts on Mango Markets with a mix of

different tokens.  Id.  Token holders, on the other hand, refer

to wallet addresses which hold Mango tokens anywhere on the

blockchain and who may use those tokens to vote in Mango DAO

proposals.  Id.  Only 31.52% of mango market depositors were

also Mango token holders at the time of the attack.  Id.

Plaintiff also notes that "[t]here is no agreement by which the

Depositors consented to be bound by votes of Mango DAO

members."  Id. at 2.

         However, while Plaintiff points out that there is no

agreement between the depositors to be bound by a vote of Mango

DAO members, plaintiff fails to address or even mention the

fact that the Mango Markets governance structure-prominently

featured on its website-provides that a majority of Mango token

holders have the right to propose and vote on binding actions

regarding Mango Markets future.  Mango Markets states on its

website that owning a Mango token gives owners "voting rights

on proposals to dictate Mango Markets future."  Dkt. No. 42-2

at 2.  It further provides that "anybody with 0.1% of Mango

Token staked can propose a governance action," that such

proposals are "executable code, not suggestions for a team  or

foundation to implement," and "if a majority, and at least 2%

of the total Mango Token supply are cast for the proposal, it

can be implemented after 2 days."  Dkt. No. 42-1 at 7.

         Here, the settlement agreement appears to have passed

N3ABLABD

via this governance process.  Approximately 473 million votes
were cast in favor of the agreement, an overwhelming majority
of the approximately 500 million Mango tokens in circulation.
Dkt. No. 41 at 2-3.  Mango DAO also later described the
agreement as having been approved through this governance
process.  In the agreement Mango DAO entered into with
depositors in which they agreed to assign their claims to
plaintiff, Mango DAO wrote "claim your lost tokens as approved
by the DAO vote."  Dkt. No. 9-3 at 2.

       While depositors may not have expressly manifested
their intent to be bound by this governance procedure and the
decisions of the Mango token holders, a user of a website-such
as the depositors may assent to the terms and conditions of a
website "merely by his or her use of the website" "as long as
there is some form of reasonably conspicuous notice," *Plazza v.*
*Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2018).  And
plaintiff does not claim that these terms were hidden or
difficult to find.

       Here, Mango depositors' decisions to open accounts and
deposit coins on Mango Markets' platform could constitute such
consent.  Thus, based on the evidence and arguments in front of
the Court at this time, it does not appear more likely than not
that the depositors will be found not to be bound by the vote
of the Mango token holders as to the release of all claims.

       For these reasons, plaintiff has not met its burden of

N3ABLABD

showing that the settlement agreement does not cover or apply
to its claims at issue in the lawsuit. Thus, the next question
is whether the contract or release is void due to duress, as
plaintiff argues.

          "To void a contract on the ground of economic duress,
the complaining party must show that its agreement was procured
by means of (1) a wrongful threat that (2) precluded the
exercise of its free will." *Interpharm, Inc. v. Wells Fargo
Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). Even
assuming that the settlement agreement here was precured by a
wrongful threat, the evidence does not support that it was
procured by means that precluded the exercise of free will. As
an illustration of their free will, Mango token holders were
presented with an initial proposed from defendant and rejected
it. Dkt. No. 35 at 7. It is also not clear why Mango token
holders could not have rejected the proposal and instead sued,
as plaintiff does here. See *Austin Instrument, Inc. v. Loral
Corp*., 272 N.E.2d 533, 535 (N.Y. 1971) (party claiming duress
must show that "ordinary remedy of an action for breach of
contract would not be adequate.")

          The evidence also indicates that even if the evidence
supported that the settlement agreement was originally obtained
by duress, it was later ratified, and therefore is not void.
"A party may ratify a contract or release entered into under
duress by intentionally accepting benefits under the contract

N3ABLABD

by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; or by acting upon it, performing under it, or affirmatively acknowledging it." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011).

In this case, the three-month delay between when the settlement agreement was entered into and when plaintiff brought suit likely did not ratify the contract. See *KiSKA Const. Corp.US v. G & G Steel, Inc.*, 2005 WL 1225944, at *7 (S.D.N.Y. May 20, 2005) ("In the present case, I find that *KiSKA* acted sufficiently promptly by repudiating the Settlement Agreement less than two months after signing it."). However, the depositor's acceptance and decision to retain (to this day) the $67 million that Plaintiff paid out in consideration for the signing of the contract likely did. "It is well established that where money paid is consideration for release acquired by fraud or duress is retained after the releaser becomes aware of the fraud or the duress is removed, ratification may be found." *Gupta v. Headstrong, Inc.*, 2019 WL 4256396, at *5 (S.D.N.Y. Sept. 9, 2019) (declining to find contract void for duress because "*Gupta* never retained the $7,000 lump sum payment that he received pursuant to the agreement"); *Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 344 (2d Cir. 2004)

("In order to avoid a finding of ratification where

N3ABLABD

consideration has been paid, it is essential that the releasor
tender back the sum received. The rule requiring the tender of
consideration received, as a condition to rescission of a
contract such as a release, is said to be a general principle
of the common law of contracts.")

In its reply brief, plaintiff also argues that the
settlement agreement is void because defendant fraudulently
induced Mango DAO members to vote for the agreement.
Specifically, plaintiff argues that defendant omitted material
information that he manipulated the Mango token price on other
exchanges by using a Ukrainian woman's passport and omitted
that he had future plans to attack Mango Markets.  Dkt. No. 37
at 6.  This argument, however, is unconvincing for a few
reasons.

First, the theory for why the contract should be
declared void is not in the complaint.  See *Inspired Cap., LLC
v. Conde Nast*, 2018 WL 6173712, at *5 (S.D.N.Y. Nov. 26, 2018),
aff'd, 803 F. App'x 436 (2d Cir. 2020) (declining to consider
allegations not in complaint).

Second, "where a plaintiff, as here, seeks to show
fraud by omission, it must prove additionally that the
defendant had a duty to disclose the concealed fact." *Merrill
Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181
(2d Cir. 2007).  Plaintiff does not indicate what duty required
defendant to disclose either of these facts, nor is one

N3ABLABD

1    evident.

2            For these reasons, the release in the settlement

3    agreement does not appear to be void either for duress or

4    fraudulent inducement; and therefore plaintiff has not met its

5    burden of showing that it is likely to succeed on the merits or

6    a sufficiently serious question going to the merits as to its

7    claim for declaratory relief exists.  Because the issue of

8    whether the waiver covers plaintiff's claims and is valid is a

9    preliminary issue; and if proven in the affirmative, would

10   preclude plaintiff's remaining claims, defendant has also

11   failed to show a likelihood of success or a sufficiently

12   serious question going to the merits as to its remaining claims

13   against defendant.  Accordingly, the first factor weighs

14   against a grant of a preliminary injunction.

15           The second factor -- the likelihood of irreparable

16   harm-similarly weighs against the grant of a preliminary

17   injunction.  As noted, this is the most important factor in

18   determining whether a preliminary injunction should issue.

19   Even accepting that plaintiff had a good reason to wait until

20   the criminal action against defendant was filed to bring this

21   action, plaintiff has failed to demonstrate that a final

22   monetary judgment in its favor at the end of the case would be

23   insufficient to protect its interests if it prevailed.

24   Plaintiff seeks only money damages and "as a general rule, of

25   course, a party may not obtain injunctive relief where it is

N3ABLABD

claiming a loss that can be adequately remedied by an award of money damages."  *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985).

Although it is true that "federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction," *In re Feit & Drexler Inc.*, 760 F.2d 406, 416 (2d Cir. 1985), plaintiff proffers little evidence that defendant intends to frustrate the judgment in this case.

Defendant is currently incarcerated and held without bail.  There is a request for forfeiture of these same assets in the criminal case.  The indictment in the criminal case seeks forfeiture of all property derived from the commission of the instant offense.  At the February 24, 2023 conference, defendant's attorneys stated that "the asset forfeiture in the criminal matter is broader than what could be entered in this case, and the defendant is not going to violate that or think about violating that."  Dkt. No. 47 at 33.

The only actual evidence that plaintiff points to of defendant attempting to frustrate the present judgment is that after the present lawsuit was filed, "a transaction occurred involving a blockchain wallet address Mango Labs identified as under defendant's control."  Dkt. No. 25 at 2.  However, defendant represents that it was "an automated transaction that

N3ABLABD

1  took place" and plaintiff does not appear to contest this.

2  Dkt. No. 47 at 33.

3        The Court also pauses to note that in light of the

4  criminal case against defendant regarding this same conduct,

5  plaintiff's rights to the assets it seeks to freeze are unclear

6  at this point in time.  The statutory provision governing

7  criminal forfeiture provides that: "all right, title, and

8  interest in property described in subsection (a) vests in the

9  United States upon the commission of the act giving rise to

10  forfeiture under this section."  21 U.S.C. § 853(c).

11        Subsection (a) of that provision provides that a

12  person punishable by imprisonment for more than one year shall

13  forfeit to the United States: "any property constituting, or

14  derived from any proceeds the person obtained, directly or

15  indirectly, as the result of such violation." 21 U.S.C. §

16  853(a).  Under these statutory provisions, right to the funds

17  that defendant allegedly converted from Mango Markets'

18  depositors seems to have vested in the United States government

19  upon commission of the alleged crime.  The United States

20  therefore also has an interest in these funds and the ability

21  to protect them, including through a restraining order, an

22  injunction or a temporary restraining order, if it believed

23  that such an order was necessary to prevent the property from

24  being destroyed, removed from the jurisdiction of the court, or

25  otherwise made unavailable for forfeiture.  21 U.S.C. § 853(e).

N3ABLABD

1              There thus exists an additional protection for

2      plaintiff -- the protection provided by the criminal case.

3      Even if plaintiff had otherwise satisfied the standards of Rule

4      65, which it has not, the Court would be reluctant to grant

5      plaintiff a preliminary injunction freezing these assets in

6      which the U.S. government  -- if successful at the end of its

7      criminal case will have rights, title, and interest.

8              Regarding the third factor, Plaintiff also has not

9      shown that the "balance of hardships tips in its favor, much

10     less 'decidedly.'"  *Centocor, Inc. v. The Kennedy Inst. of*

11     *Rheumatology*, 2008 WL 4726036, at *4 (S.D.N.Y. Oct. 29, 2008)

12     (noting that party seeking injunction must show that balance of

13     hardships tips decidedly in the movant's favor).

14             Although denial of this motion creates some

15     possibility of plaintiff's potential judgment being depleted.

16     Defendant states that an order freezing his assets could have

17     this same effect.  Defendant stated at the conference on

18     February 24, 2023, that his assets are currently held in

19     cryptocurrency and there is therefore the risk that they will

20     "go up and down."  Dkt. No. 47 at 34.  To preserve their value,

21     defendant noted that his assets "need to be overseen and

22     somehow managed" rather than frozen.

23             Because these three factors all weigh against the

24     issuance of an injunction or are neutral, the Court holds that

25     the proposed preliminary injunction is not warranted in the

N3ABLABD

1   action.  Since a preliminary injunction shall not issue in this

2   case, the Court does not consider whether the issuance of an

3   injunction would harm the public interest.  See *U.S. S.E.C. v.*

4   *Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir.

5   2012) ("When a court orders injunctive relief, it should ensure

6   that injunction does not cause harm to the public interest.")

7          That concludes the opinion of the Court.  In short,

8   the Court denies the request for a preliminary injunction and

9   the temporary restraining order is dissolved.

10         Is there anything for me to address today from

11  plaintiff?

12         MR. BURSHTEYN:  Yes, your Honor, if I may make one

13  request.

14         THE COURT:  Sure.

15         MR. BURSHTEYN:  Plaintiff would request, given that

16  the forfeiture would only occur after a conviction, if your

17  Honor would consider providing a small amount of time for the

18  temporary restraining order to continue for the department of

19  justice to be apprised of this order.

20         They can, as your Honor mentioned, seek their own TRO.

21  They may also have the ability to seek a seizure warrant, and

22  that's all that plaintiff has at this time, your Honor.

23         THE COURT:  Any objection to that from defendant's

24  perspective?  Let me ask plaintiff, how long are you

25  requesting?

N3ABLABD

1          MR. BURSHTEYN:  Your Honor, just a reasonable period

2     to apprise the department of justice, perhaps seven to ten

3     days.

4          THE COURT:  What is the defendant's position about

5     seven days?

6          MR. BERKOWITZ:  Defendant's position is that the

7     department of justice has been aware of these proceedings.

8     They've chosen not to intervene here.  We don't see that as

9     being necessary.

10         THE COURT:  I think the request by the plaintiff is a

11    reasonable request.  I probably would have granted the request

12    if it was framed in terms of having a temporary continuance of

13    the TRO in order to consider whether to take an appeal from my

14    order.  So I think it is a fair request, and I'm going to order

15    that the TRO expire March 15, 2023.

16         MR. BURSHTEYN:  Your Honor, while plaintiff does not

17    have a position yet on appeal, we do look forward to reviewing

18    the order and discussing with our client.

19         THE COURT:  That's obviously your right.  Anything

20    further from defendant?

21         MR. BERKOWITZ:  No, your Honor.

22         THE COURT:  Can plaintiff remind me.  I take it I've

23    not scheduled an initial pretrial conference in this case.  Is

24    that right?

25         MR. BURSHTEYN:  That's right, your Honor.

N3ABLABD

1          THE COURT:  While we're all here, maybe it makes sense

2    for me to set a date.  You'll also want to inform the

3    U. S. Attorney's office of that date.  I don't know whether

4    they would want to intervene and seek a stay of this action.

5    They do sometimes seek that form of relief.  And I'm not

6    prejudging whether or not they would be entitled to it, just

7    that they should be apprised of the initial pretrial

8    conference.

9          MR. LAWRENCE:  Your Honor, we have an April 3rd,

10   response day in this action. Would you like to hold the

11   conference before?  That's the date to either answer or move to

12   dismiss, would you like a date before or after that.

13         THE COURT:  I'll hear from defendant with respect to

14   that.

15         MR. BERKOWITZ:  Thank you.  Defendants would prefer to

16   have the initial conference after the response date once we've

17   decided on the course for this.  To be honest, it could take us

18   sometime to confer with our client because of the situation.

19         THE COURT:  That's reasonable, and it'll also make the

20   Rule 16 conference that you'll need to have before the

21   conference before me meaningful, and that's not an extended

22   period of delay.  Unless plaintiff has an objection to that,

23   I'm prepared to schedule something in mid-April.

24         MR. LAWRENCE:  Not at all, your Honor.  No objection

25   to be clear.

N3ABLABD

1      THE COURT:  How is April 17, at 11 a.m. work for the

2  plaintiff?

3      MR. LAWRENCE:  I'm sure it will work for me, your

4  Honor.

5      THE COURT:  And I'm prepared to have that

6  telephonically unless either party would like to come in for

7  it.  What's plaintiff's position?

8      MR. LAWRENCE:  Telephonically would be preferable,

9  your Honor.

10      THE COURT:  From the defendant's perspective, does

11  April 17th work?

12      MR. BERKOWITZ:  Yes, and likewise we'd also prefer

13  telephonically.

14      THE COURT:  I'll hold the initial pretrial conference

15  on April 17. Under my orders for initial pretrial conferences,

16  you'll notice that I require that the parties submit a proposed

17  case management plan.  I also provide that the time for making

18  a motion to dismiss is adjourned if you submit a letter

19  indicating to me that you intend to make a motion to dismiss.

20  If that is the case, I will then at the initial conference set

21  a date for the motion to dismiss.  It's not intended as a means

22  to permit the delay of the filing of a motion to dismiss.  It's

23  simply is intended to have the parties discuss the potential

24  motion and to raise any issues with me.

25      I do that in lieu of the parties submitting premotion

N3ABLABD

1   letters, so you'll see that in my order in my initial

2   practices.  Anything else from plaintiffs?

3           MR. LAWRENCE:  No, your Honor.

4           THE COURT:  From defendant?

5           MR. BERKOWITZ:  No, your Honor.

6           THE COURT:  Thank you, all.  I assume somebody is

7   going to order a copy of this transcript.

8           MR. LAWRENCE:  We will, your Honor.

9           THE COURT:  Good.  Thank you.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

O4ACeis4

1    consider a stipulation, but I am not sure we're going to accept

2    one because I think because we would like to prove it up

3    potentially.  So I think if there's going to be an issue on the

4    exhibits, we should air it now.

5         THE COURT:  Mr. Klein, do you have a proposed

6    stipulation?

7         MR. KLEIN:  Your Honor, unfortunately, the person

8    handling this is Ms. Martabano, and she stepped out.  I don't

9    have anything.  I would like to talk with her.

10        THE COURT:  Why don't we address this before the jury

11   comes back.

12        All right.  Mango Markets.  Who's going to handle

13   that?  And do we have counsel for Mango Markets here?

14        MR. BURSHTEYN:  Yes, your Honor.

15        THE COURT:  You may approach.

16        MR. BURSHTEYN:  Thank you, your Honor.

17        Hello, your Honor.  Mike Burshteyn on behalf of Mango

18   Labs.

19        THE COURT:  How many documents are we talking about

20   here that are in dispute?

21        MR. BURSHTEYN:  Your Honor, part of the dispute is the

22   defendant's request for the amount.

23        THE COURT:  I thought we had largely resolved this and

24   that there were a small, much smaller number of documents at

25   issue.

O4ACeis4

1           So Mr. Greenspan, are you covering this for the

2   defense?

3           MR. GREENSPAN:  I am, your Honor.

4           THE COURT:  What's the actual dispute here that the

5   Court needs to resolve?

6           MR. GREENSPAN:  That's a good place to start.  We

7   received a production, one significant production and one very

8   small production from Mango Labs.  They've represented to us

9   that these are all the documents that they are going to

10  produce.  And the one thing that's left outstanding is they've

11  told us that they've withheld a certain number of documents for

12  privilege, and we've also seen some redactions on some of the

13  documents they've produced to us.

14          THE COURT:  Hold that thought for the moment.

15          I'm eating into your break.  So if anyone needs to do

16  something other than listen to this issue, then you're free to

17  leave.

18          Mr. Greenspan, please continue.

19          MR. GREENSPAN:  And so, we've tried to negotiate with

20  Mango Labs, and basically they've told us they don't want to

21  produce the privilege log.  We said that's okay, but we need

22  some information on which to understand how many documents are

23  withholding, what the nature of the privilege is, let's

24  negotiate on something short of a privilege log.  We proposed a

25  categorical approach with some number of documents and asked

O4ACeis4

1    them for more information on documents that didn't involve a

2    lawyer, conversations that didn't involve a lawyer and less

3    information on others.  We thought that was a reasonable way to

4    do this.  And their counterproposal is we're not going to give

5    you any privilege information at all, you're not entitled to it

6    under the criminal laws, and we just don't think that's

7    correct.

8        THE COURT:  What are we talking about in terms of the

9    substance?  What's the category such that the documents that

10   are outstanding would meet the Nixon standard?

11       MR. GREENSPAN:  We have no idea what documents have

12   been withheld, how many or what they're about.  We've reduced

13   the seven requests to one request about communications between

14   and among Mango people about the attack itself.  So we think it

15   goes directly to the heart of the matter.  We really have no

16   idea what's been withheld from us.  We don't even know what the

17   basis is.

18       THE COURT:  Give me the relevance and then give me

19   admissibility so that I understand that what you're asking for

20   would satisfy the test.  I don't think, while under normal

21   circumstances if you were in civil discovery, it would be a

22   fair argument to say, well, I don't know what's being withheld,

23   but I at least need an understanding that documents within a

24   category that would be both relevant and admissible are being

25   withheld potentially so that I can evaluate it at that high

O4ACeis4

1  level before getting into the details.

2              MR. GREENSPAN:  I understand that.  Can I have a

3  moment to confer with my client?

4              THE COURT:  Yes.

5              (Counsel and defendant conferred)

6              While they're doing that, Mr. Burshteyn, have you

7  collected the documents that have been requested, even if

8  they're being withheld for privilege?

9              MR. BURSHTEYN:  Your Honor, yes, we did comply with

10  the Court's order last night.  There was some authority I was

11  hoping to present to the Court regarding the standard for *in*

12  *camera* review in this situation.  It is in the room.

13              THE COURT:  What's the volume?

14              MR. BURSHTEYN:  Your Honor, part of our concern is by

15  providing the volume to defendant, that would enable them to

16  continue on this fishing expedition.

17              THE COURT:  No, it won't.  I won't let it.  But, I

18  need know what the volume is.  So what is the volume?

19              MR. BURSHTEYN:  Your Honor, may I approach, perhaps,

20  and tell it to you?

21              THE COURT:  No, you can tell me what the volume is.

22  The volume is not going to bear on my ultimate decision here.

23  I want to know whether it is something even feasibly the Court

24  could review if we get to that point.  But I will of course

25  hear you out on your objections.  And as you can tell, I'm

O4ACeis4

1     familiar with the issue and I am applying the appropriate

2     standard governing Rule 17 subpoenas.

3              MR. BURSHTEYN:  Yes, your Honor.  I'll say the number

4     of, per your order.  It's 86.

5              THE COURT:  And you have a folder with these documents

6     in there?

7              MR. BURSHTEYN:  Yes, your Honor.

8              THE COURT:  Understood.

9              MR. BURSHTEYN:  If I may, your Honor.  We produced

10    over 140 documents prior to the response deadline so that both

11    parties could have more time to review, even though after the

12    Court's order, we met and conferred and sent a letter to

13    defendant explaining that even with the Court's order, what we

14    produced is beyond what's called for.  This idea that they've

15    narrowed, your Honor, actually shows that it's a fishing

16    expedition.  Out of seven requests, they dropped six of them,

17    two after the Court denied the motion to quash, because your

18    Honor's clear that what they're doing is trying to get

19    discovery to, you know, what appears to be an attempt to

20    circumvent the state civil case.

21              This idea that this new narrowing of communications

22    regarding the attack and the settlement, it would be very

23    expected and reasonable that after an entity is attacked, that

24    it would seek the advice of legal counsel, your Honor, or in a

25    discussion about essentially a ransom negotiation, there would

O4ACeis4

1   also be communications with lawyers.

2          So, in our view, your Honor, the categories themselves

3   that they're seeking show that it's a fishing expedition and

4   make this very fraught inquiry into privilege.  I can go in, I

5   don't want to belabor it now unless you'd like me to.

6          THE COURT:  Let's hear from Mr. Greenspan.

7          MR. GREENSPAN:  Your Honor, just addressing a couple

8   things there and then coming back to the Court's question.  We

9   dropped two categories, those related to the pop-up and in

10  terms of service postdating the attack because we were able to

11  agree with the government on ways to get those in through the

12  documents we had not because they weren't relevant or exceeded

13  the scope.

14         As for the documents we've seen, and presumably the

15  documents that are withheld, they go to how Mango understood

16  the attack both in real time and shortly thereafter when they

17  understood things.  These are discussions involving witnesses

18  in this case, including the witness on the stand, as well as

19  Mr. Durairaj, who we understand is going to be a witness coming

20  up and a central at that, and how they made decisions to react

21  and what they did.

22         So these go to the heart of the case --

23         THE COURT:  So what you're saying is what's ramming is

24  not a fishing expedition, but is limited to the category of

25  documents and the inquiry that the government has itself

O4ACeis4

1    engaged in in measuring the expectations and whether things

2    would have mattered to contributors and users of Mango Markets

3    at or around the time in question; is that fair?

4              MR. GREENSPAN:  Precisely.  There's background

5    information --

6              THE COURT:  Anything else?

7              MR. GREENSPAN:  There's also information that goes

8    directly to materiality in terms of how it relates to the

9    elements of the case.

10             THE COURT:  What was the specification that you

11   provided to Mango Labs that would narrow it to that particular

12   issue?

13             MR. GREENSPAN:  You mean what was the text of the

14   request?

15             THE COURT:  The expectations and understandings of

16   Mango Markets participants at or around the time of the

17   incident as to the nature of what occurred, which is, as I

18   understand it, a general summary of the category.

19             MR. GREENSPAN:  Your Honor, we narrowed the timeframe

20   down to a very narrow timeframe, around October 11th, and it

21   was related specifically to conversations among these decision

22   makers at Mango DAO.  So this was supposed to be narrow in

23   scope and narrow in substance to go to these things.

24             THE COURT:  To the extent there are communications

25   with counsel, you're not seeking those?

O4ACeis4

1          MR. GREENSPAN:  We're not seeking those.  We're just

2    trying to understand if there were and make some evaluation.

3    We've really tried to be flexible in how to do that.  We've

4    gotten really a refusal to engage from the other side.

5          THE COURT:  So Mr. Burshteyn, I don't want to review

6    86 documents *in camera*, but are you able to go through those

7    documents to determine which ones are with counsel?  And it may

8    be that there's only a small volume left.  However, I do

9    believe that given how the request has been narrowed, it would

10   satisfy the Nixon standard because it goes to an issue that has

11   come up in this trial and has become a relevant issue and it is

12   only about that, it is not about anything else.  And you tell

13   me if it's about something else and I'm missing something,

14   because if that's the case, then you may have a fair argument,

15   but if it's really only about this and really only a narrow

16   time slice around October 2022, then it would seem to be the

17   proper subject of a subpoena.

18          MR. BURSHTEYN:  Thank you, your Honor.

19          So Mango Labs does not agree with how they

20   characterized their request.  I can quote what they said, which

21   is documents and communications within your possession

22   regarding what you called "the exploit" and the reactions to

23   it.  So it is any document regarding the exploit --

24          THE COURT:  But what's the time period?

25          MR. BURSHTEYN:  It's from October until December.  So

O4ACeis4

1    it's three months after where you would expect to see many

2    communications with counsel regarding the exploit.

3           Now, your Honor, if it's further narrowed to just the

4    expectations around the attack, many of that 86 number, I don't

5    know, many would be not even responsive to that.  The way

6    they're characterizing it isn't what we understood or what they

7    said, I think, again, demonstrates why this is still a fishing

8    expedition.

9           THE COURT:  Mr. Greenspan.

10          MR. GREENSPAN:  I think the terms he just used, this

11   is about what they're characterizing as the exploit.  These are

12   specific statements about the facts at issue here.  And the

13   timeframe, three months is not so substantial.  And the people

14   involved, the number of custodians we understand is relatively

15   limited.  As far as the insinuation that keeps coming up over

16   and over again with really no foundation that this is about the

17   civil case, we've represented in writing to Mango Labs that we

18   won't use this in the civil case.  We've told them we'd agree

19   to a protective order subject to getting the government to

20   agree, which hasn't happened.  We keep hearing the same

21   arguments over and over again about some kind of improper use,

22   but it's not about that, it's about going to the heart of this

23   case.  We intend to use these documents in this trial in the

24   coming days.

25          MR. BURSHTEYN:  Your Honor, but there has to be some

O4ACeis4

```
 1   basis, some good-faith basis for why these documents that are
 2   being withheld may not be privileged.  And there's authority on
 3   that.  The Supreme Court has held that this type of a fishing
 4   expedition --
 5             THE COURT:  Hold on.  Hold on.  Let's try to narrow
 6   this down.
 7             First of all, I don't believe that documents that
 8   would have been in December would satisfy the Nixon standard.
 9   So we're really talking about October and November.  So let's
10   limit it in that way.
11             Second, if there are communications actually with
12   counsel, then I don't believe that there's grounds for
13   production.  I can't imagine what those communications would
14   be, other than privileged communications pertaining to legal
15   advice regarding the exploit.  So that's a further narrowing.
16             So what remains may be a small number of documents,
17   which you could just turn over to Mr. Greenspan, and then we'd
18   be done with this issue.
19             So, what I'll ask you to do, Mr. Burshteyn, in the
20   next few minutes, take a look at the documents and turn the
21   remaining documents over to Mr. Greenspan.  If you believe that
22   some of the remaining documents still present a privilege issue
23   because they reflect attorney advice, then you can furnish just
24   those documents over to the Court for in camera review.
25             MR. BURSHTEYN:  Your Honor, if I may just very
```

O4ACeis4

1    briefly.  I can say now that there are three documents without

2    lawyers that have been withheld, and subject to our --

3              THE COURT:  So then why are we here?

4              MR. BURSHTEYN:  We can show them to the Court.  We're

5    very concerned about showing them to defendant.

6              THE COURT:  This is something that the parties could

7    have worked out --

8              MR. BURSHTEYN:  We attempted, your Honor.  Sorry this

9    has come to the Court.

10             THE COURT:  Let's see those three documents.

11             MR. GREENSPAN:  We had no idea they were three

12   documents.  This really would have helped when we asked them

13   for that number.

14             MR. BURSHTEYN:  May I approach, your Honor?

15             THE COURT:  You may.

16             MR. BURSHTEYN:  Your Honor, if you go to the last tab,

17   the very, very last tab of the binder.

18             THE COURT:  Okay.

19             MR. BURSHTEYN:  And then, your Honor, if you just go

20   to the tab right before that.

21             THE COURT:  So now you've redacted these.  Have the

22   redacted documents been produced?

23             MR. BURSHTEYN:  Yes, your Honor.  And so, I'm showing

24   you here what we've redacted.

25             THE COURT:  Let me get this straight.  We're talking

O4ACeis4

1    about three documents that have been produced, just not in

2    unredacted form?

3              MR. BURSHTEYN:  Yes.  Although, your Honor, if you

4    give me a minute, I believe that there's -- we may need to

5    doublecheck.  There may be three others in the binder that I

6    need to pull out for you.  I'll have to confirm which ones

7    those are.

8              THE COURT:  Mr. Greenspan, is this dispute about these

9    three documents that have been produced, although, are in

10   redacted form.

11             MR. GREENSPAN:  I didn't understand that.  I had no

12   idea how many documents there were.  If he's Mango Labs is

13   representing these are the only three documents that don't

14   involve lawyers --

15             MR. BURSHTEYN:  I believe there's more, they're just

16   lumped with the others that are with attorneys.  I need to pull

17   these out.

18             THE COURT:  Can you pull these those three out and

19   we'll address them.  This is not an urgent pressing issue, so

20   we'll address it --

21             MR. BURSHTEYN:  At the next break, I can have them

22   ready for you.

23             THE COURT:  And I'll give you this binder back.

24             MR. BURSHTEYN:  Thank you, your Honor.  I appreciate

25   the Court's attention.

O4ACeis4

1              MR. TALKIN:  Your Honor, I have one more issue.  We do

2      need the government here for it.

3              THE COURT:  We'll pick it up before the jury comes

4      back.

5              MR. TALKIN:  But it's with Mr. Burshteyn.

6              THE COURT:  Are you going to be here?

7              MR. BURSHTEYN:  Not going anywhere.

8              (Luncheon recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

 Realms    Leaderboard    Read the Docs ↗         **Connect** Phantom 

‹ Back    

# SEC Settlement Offer Proposal

Proposed by: 5wZ6N7cDCocEskFdWRo2sU9UmopiekS2naQ8S7gproE8

Completed

### DAO Settlement Proposal

As set forth in https://app.realms.today/dao/MNGO/proposal/67fLnjf928GUm6ou8pTxh58WKxQy VXpd2YhXjcecciBM following the Mango Markets exploit in October of 2022, there have been investigations by U.S. regulators (DOJ, SEC, and CFTC) against Eisenberg for his role in the exploit. In addition to those actions, some regulators have made their own inquiries into Mango Markets. These inquiries will collectively be referred to as the "U.S. regulatory matters."

One of the U.S. regulatory matters is with the SEC, which alleges that the DAO has violated Sections 5(a) and 5(c) of the Securities Act of 1933, that Mango Labs has violated 15(a) of the Securities Exchange Act of 1934, and that Blockworks has violated Sections 5(a) and 5(c) of the Securities Act of 1933 and Section 15(a) of the Securities Exchange Act of 1934. In order to resolve the SEC's allegations against the DAO, this proposal is to authorize CyberByte sp. z.o.o, which is serving as the Representative of the DAO ("DAO Representative") in connection with the U.S. regulatory matters, subject to the terms below, to make a binding settlement offer to the SEC on behalf of the DAO which would include the payment of a civil monetary penalty, injunctive relief, and undertakings, to execute the settlement documents on behalf of the DAO, and to execute the undertakings called for by the settlement if accepted by the SEC. As part of the settlement offer, the DAO would not be admitting or denying the SEC's allegations.

Due to the rules regarding the confidentiality of settlement discussions and because the SEC's investigation is ongoing and non-public as a matter of law, the DAO Representative is limited in the information that it is permitted to share in a non-privileged context and, as such, cannot comment on the SEC's investigation or the settlement negotiations in this forum. The DAO Representative cannot discuss any aspect of the U.S. regulatory matters with individual DAO members without first consulting the DAO's legal counsel. Balancing these confidentiality restrictions with the need for transparency to the members of the DAO, the terms of the proposal set forth the general framework of the proposed settlement with the SEC. A settlement with the SEC would avoid litigation brought by the SEC against the DAO with respect to these allegations.

### Terms of Proposal

-This proposal, if approved, will authorize the DAO Representative to propose a settlement offer to the SEC that would include the payment of a civil penalty in the amount of $223,228, to be paid from the DAO Treasury to the SEC and permanently enjoin the DAO from violating Sections 5(a) and 5(c) of the Securities Act of 1933. The DAO Representative will be authorized to transfer USDC from the DAO Treasury and convert to USD in the amount of the penalty to be

held in escrow while the SEC Commissioners evaluate final approval of the DAO's settlement offer.

-The settlement offer would also agree that the DAO will, and certify compliance, immediately cease all of its offers, sales or resales of MNGO tokens on the protocol through the means or instrumentalities of interstate commerce in the United States; destroy or otherwise make unavailable for trading, selling, offering, or purchasing any and all MNGO tokens in the DAO's possession or control within 10 days of the entry of the Final Judgment; issue written requests to remove MNGO tokens from any further trading on all crypto asset exchanges and trading platforms where the DAO is aware MNGO is trading within 30 days of the entry of the Final Judgment; and refrain, directly or indirectly, from soliciting any trading platform to allow trading in MNGO and offering or selling, directly or indirectly, MNGO, unless such offering is properly registered under applicable laws in the United States. -Should the DAO acquire any MNGO tokens in the future, it shall destroy or otherwise make any of those MNGO tokens unavailable for trading, selling, offering or purchasing within 10 days of receipt. Nothing in this provision shall prevent the DAO from conducting a partial or total dissolution or liquidation of its non-MNGO assets in the DAO Treasury through the acquisition of MNGO tokens from DAO members.

-This proposal authorizes the DAO Representative and the DAO's legal counsel to sign a Consent Certificate of Resolution on behalf of the DAO, which would represent the DAO's binding settlement offer to the SEC and would be binding against the DAO if accepted by the SEC.

-Should the SEC accept the DAO's settlement offer, the DAO Representative is authorized to undertake all actions needed to fully comply with the Consent and any Final Judgment entered against the DAO.

-This settlement, if accepted by the SEC, will be binding on the DAO. By approving this proposal, the DAO will be expected to fully comply with the terms of the settlement if accepted, including working with the DAO Representative in effecting the terms of the settlement and not taking any action or permitting any public statement denying, directly or indirectly, any of the SEC's allegations or creating the impression that the allegations are without factual basis.

-This proposal would authorize the DAO Representative to release funds from the DAO Treasury in the total amount of $223,228 USD to be held escrow while the SEC considers the DAO's settlement offer, which would then be paid to the SEC to satisfy the Final Judgment against the DAO. The proposal would authorize the release of funds from the DAO Treasury in the amount of $446,456 to be paid to the SEC to satisfy the Final Judgment against Mango Labs and Blockworks.

-Upon acceptance of the DAO's settlement offer by the SEC, the DAO Representative will post the Final Judgment and will submit another proposal for authorization to effect the terms of the Final Judgment, including the release of the escrowed funds to be paid to the SEC and to take any and all required actions in connection with MNGO tokens in the DAO's Treasury and on the protocol in the United States as called for by the Final Judgment.

-The DAO will agree to defend, hold harmless, and indemnify the DAO Representative from any cost, loss, or damages of any type, including attorneys' fees, to the extent that they arise from the breach of any agreements, except for willful misconduct, gross negligence, and/or fraud arising from their in executing the terms of the settlement with the SEC.

## Results

✓ **The proposal has passed**

Yes Votes

**387,030,959**

100.0%

No Votes

**236**

0.0%

Explore ›

## Voting Rules

👥 Community    🕐 3d    ⚖ 2%    ⚖ Disabled

## Discussion (2)

Thoughts?...

**Send It**

© 2024 Realms Today Ltd  |  Terms  |  Privacy Policy

Read the Docs

Powered by **Solana**

# EXHIBIT 4

 Realms    Leaderboard      Read the Docs        Connect Phantom

‹ Back

# DAO Representative

Proposed by: 5wZ6N7cDCocEskFdWRo2sU9UmopiekS2naQ8S7gproE8

Completed

DAO Representative Proposal

Following the Mango Markets exploit in October of 2022, there has been investigations by U.S. regulators (DOJ, SEC, and CFTC) against Eisenberg for his role in the exploit. In addition to those actions, some regulators have made their own inquiries into Mango Markets. These inquiries will be collectively be referred to as the "U.S. regulatory matters."

To efficiently respond to these issues, it would be beneficial for the DAO to appoint an individual who can (1) hire legal counsel, and (2) partake in confidential and privileged communications with legal counsel to facilitate amicable resolutions to the U.S. regulatory matters. This individual will be referred to as the "Representative."

CyberByte sp. z.o.o is an entity whose purpose is to serve as the Representative of the DAO to work with the DAO's legal counsel and to communicate to the DAO the recommendations of the DAO's legal counsel in connection with the U.S. regulatory matters, subject to the terms and conditions below:

Terms of Proposal

- The Representative's term will be established for a set duration of one year. Upon completion of this term, a re-proposal would be required to either extend the term or appoint a new Representative. This ensures that the position isn't held indefinitely without review.

- Should the Representative choose to resign during their term, they have the ability to deliver a resignation proposal to the DAO. This proposal would not necessitate any external approvals. A subsequent post on the DAO's Discord or forum would then publicly announce this resignation for clarity and transparency to all DAO members. However, in such an event, the Representative will facilitate the transition to a new representative that is proposed to and approved by the DAO through the DAO's legal counsel.

- The scope of the Representative is limited exclusively to work with the DAO's legal counsel and to communicate to the DAO the recommendations of the DAO's legal counsel in connection with the U.S. regulatory matters. In the event of other situations involving the DAO outside of the U.S. regulatory matters, the appointment of a new representative or a modification of this proposal would be necessary. The Representative is not authorized to accept service on behalf of the DAO.

- The Representative is not authorized to bind the DAO to any agreements unless the express approval of the DAO is first obtained. The Representative's role is to work with the DAO's legal counsel and communicate the recommendations of the DAO's legal counsel to the DAO in connection with the U.S. regulatory matters.

- The DAO will agree to defend, hold harmless, and indemnify the Representative from any cost, loss, or damages of any type, including attorneys' fees, to the extent that they arise from the breach of any agreements, except for willful misconduct, gross negligence, and/or fraud arising from the Representative's performance.

- As compensation, the Representative will be remunerated with an initial flat fee payment of $30,000, and will subsequently be paid on an hourly basis at $500 USDC per hour. An accounting will be provided to the DAO's legal counsel upon the end of the 12-month term. If the Representative resigns or is terminated for cause during the 12-month term, the Representative agrees to forfeit or return a pro-rata portion of the above-described flat fee at an increment of $2,500 per month.

- For the first four weeks, the Representative will provide a summary of the number of hours billed on a weekly basis to the DAO's legal counsel for review. After the first four weeks, the Representative will provide a monthly update on the number of hours billed on this project via the same method to the DAO's legal counsel.

- The DAO maintains the right to review the performance of the Representative via the DAO's legal counsel at any point. Should the DAO or the DAO's legal counsel determine that the Representative is not acting in its best interests or is not effectively fulfilling the stipulated role, the DAO can initiate a recall or replacement process via a DAO vote following a proposal to the DAO.

- The Representative agrees that they will communicate solely with the DAO's legal counsel prior to making any public statements, postings, or comments that relate to the U.S. regulatory matters in any way. The Representative agrees that they cannot discuss any aspect of the U.S. regulatory matters with individual DAO members without first consulting the DAO's legal counsel.

- This framework has been crafted to give the DAO a well-defined, transparent process to interact with the U.S. regulators in connection with the U.S. regulatory matters while maintaining its foundational principles.

Funding Request Details

Accordingly, the Representative requests $250,000 USDC to cover (1) the above-described compensation; (2) legal costs related to entity formation and individual counsel for the Representative; and (3) costs for U.S. legal counsel to represent the DAO's interests in connection with the U.S. regulatory matters.

The Representative will be authorized to sign the engagement letter to retain the DAO's legal counsel on behalf of the DAO, pay the initial retainer for the DAO's legal counsel, receive and review the monthly invoices from the DAO's legal counsel, and to make monthly payments to the DAO's legal counsel.

Any unused funds shall be returned to the DAO in full when any of the following events occur: The Representative's services are completed or terminated, are no longer needed, or the 12-month period has elapsed, whichever comes first. If there are any outstanding bills or expenses to be paid (for example, a law firm or other service provider), those funds will be kept to satisfy those obligations that are within the scope of the Representative's duties under this proposal.

This Proposal, once approved by the DAO, will constitute a binding contract the DAO and the Representative, and will constitute the complete and final agreement of the parties. Any disputes arising under or relating to this agreement shall be subject to the exclusive jurisdiction of the courts of the United Kingdom.

| Instructions | ⌄ |
|---|---|

## Results

✓ **The proposal has passed**

| Yes Votes | No Votes |
|---|---|
| **253,702,627** | **0** |
| 100.0% | 0.0% |

Explore ›

## Voting Rules

⚇ Community    🕐 3d    ⚖ 2%    ⚗ Disabled

## Discussion (0)

Thoughts?...

**Send It**

 



© 2024 Realms Today Ltd | Terms | Privacy Policy

Read the Docs

Powered by **Solana**

# EXHIBIT 5



SOLSCAN $198.81 -0.56% Avg Fee: 0.00005717

# Transaction Details

Search transactions, blocks, programs and tokens

**Featured:** Unlock the Power of Solana with **Solscan Pro API V2.**

Buy | Exchange | Play | Gaming

Overview | SOL Balance Change | Token Balance Change

**Signature**

4KcwMmoNLtmHNX9si3D3DapeiuXAmeiJhrQBQQM6iiDBXWUzpKTNx5PY4Y7sC3HT... Inspect Tx

**Block** 259460061

**Result**

SUCCESS Finalized (MAX Confirmations)

**Signer**

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk

**Transaction Actions**

Tx Maps

Legacy Mode | Summary Mode | View Token Account

**Interact** with instruction **Deposit** on 4Q6WW2...HnAFHo

Transfer from FLCNpE...mXPSUk to D9VdFD...1RBTFt for **333,450,822** $6,789,058.73 MNGO

**Sponsored**

Fee    0.000041 SOL ($0.008151)

Priority Fee    0.000036 SOL ($0.007157)

Compute Units Consumed    121,612

Transaction Version    Legacy

Previous Block Hash    2wZMoFjEVqzaYS9bf... ⧉

## Instruction Details

Hide details ⌃

📝 Your Notes ✎

**#1 - Mango Governance: Unknown**    **Raw**

Interact With

Mango Governance

GqTPL6qRf5aUuqscLh8Rg2HTxPUXfhhAXDptTLhp1t2J ⧉

Input Accounts

#1 - Account:    DPiH3H3c7t47BMxqTxLsuPQpEC6Kne8GA9VXbxpnZxFE ⧉

#2 - Account:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk    WRITABLE    SIGNER    FEE PAYER

#3 - Account:    FyvCRWS1VHXYFHP2f2UoMnNppJ4tiQY6qm85PvyqFvQ1 ⧉    WRITABLE

#4 - Account:    🥭 MNGO ⧉

#5 - Account:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk    WRITABLE    SIGNER    FEE PAYER

#6 - Account:    System Program ⧉    PROGRAM

Instruction Data

↻ 17 ⧉

Inner Instructions

**#1.1 - System Program: CreateAccount**    **Raw**

Interact With

System Program

11111111111111111111111111111111 ⧉

Instruction Data

New Account:

FyvCRWS1VHXYFHP2f2UoMnNppJ4tiQY6qm85PvyqFvQ1 ⧉    WRITABLE

Source:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk ⧉    WRITABLE    SIGNER    FEE PAYER

Transfer Amount:

**0.0028536** ⇄ SOL

Program Owner:

Mango Governance ⧉    PROGRAM

## #2 - Voter_stake_registry: CreateVoter                                           Raw

Interact With

Voter_stake_registry

4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo ⧉

Input Accounts

#1 - Registrar:  4WQSYg21RrJNYhF4251XFpoy1uYbMHcMfZNLMXA3x5Mp ⧉

#2 - Voter:  D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt ⧉    WRITABLE

#3 - Voter Authority:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk ⧉    WRITABLE    SIGNER    FEE PAYER

#4 - Voter Weight Record:  GcL4DYoqgfwLegdNsr6tYwMRRf9mWnPc11LhFMCzKhwp ⧉    WRITABLE

#5 - Payer:  FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk ⧉    WRITABLE    SIGNER    FEE PAYER

#6 - System Program:  ⇄ System Program ⧉    PROGRAM

#7 - Rent:  ⇄ Rent Program ⧉

#8 - Instructions:  ⇄ Sysvar: Instructions ⧉

Instruction Data

```
▼ { 2 items
  ▼ voterBump : { 2 items
      type : "u8"
      data : 254
  }
  ▼ voterWeightRecordBump : { 2 items
      type : "u8"
```

```
        data : 254
    }
}
```

Inner Instructions

### #2.1 - System Program: CreateAccount                                   Raw

Interact With

System Program

11111111111111111111111111111111 📋

Instruction Data
New Account:

D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt 📋  WRITABLE

Source:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk 📋  WRITABLE  SIGNER  FEE PAYER

Transfer Amount:
**0.01987776** 💠 SOL

Program Owner:

4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo 📋  PROGRAM

### #2.2 - System Program: CreateAccount                                   Raw

Interact With

System Program

11111111111111111111111111111111 📋

Instruction Data
New Account:

GcL4DYoqgfwLegdNsr6tYwMRRf9mWnPc11LhFMCzKhwp 📋  WRITABLE

Source:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk 📋  WRITABLE  SIGNER  FEE PAYER

Transfer Amount:
**0.00211584** 💠 SOL

Program Owner:

4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo 📋  PROGRAM

### #3 - Voter_stake_registry: CreateDepositEntry                          Raw

Interact With

Voter_stake_registry

4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo

Input Accounts

#1 - Registrar:  4WQSYg21RrJNYhF4251XFpoy1uYbMHcMfZNLMXA3x5Mp

#2 - Voter:  D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt  `WRITABLE`

#3 - Vault:  GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP  `WRITABLE`

#4 - Voter Authority:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk  `WRITABLE`  `SIGNER`  `FEE PAYER`

#5 - Payer:  FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk  `WRITABLE`  `SIGNER`  `FEE PAYER`

#6 - Deposit Mint:  🔶 MNGO

#7 - System Program:  ⬚ System Program  `PROGRAM`

#8 - Token Program:  ⬚ Token Program  `PROGRAM`

#9 - Associated Token Program:  ⬚ Associated Token Account Program  `PROGRAM`

#10 - Rent:  ⬚ Rent Program

Instruction Data

```
          ▼ type : { 1 item
          |   defined : "LockupKind"
          }
          ▼ data : { 1 item
          |   ▶ none : {} 0 items
          }
        }
      ▼ startTs : { 2 items
          ▼ type : { 1 item
          |   option : "u64"
          }
          data : NULL
        }
      ▼ periods : { 2 items
```



```
      }
   }
}
```

Inner Instructions

#### #3.1 - Associated Token Account Program: Create                     Raw

Interact With

Associated Token Account Program

ATokenGPvbdGVxr1b2hvZbsiqW5xWH25efTNsLJA8knL 📋

Instruction Data

Account:

GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP 📋   [WRITABLE]

Mint:

🪙 MNGO 📋

Source:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk 📋   [WRITABLE] [SIGNER] [FEE PAYER]

System Program:

≡ System Program 📋   [PROGRAM]

Token Program:

≡ Token Program 📋   [PROGRAM]

Wallet:

D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt 📋   [WRITABLE]

#### #3.2 - Token Program: GetAccountDataSize                     Raw

Interact With

Token Program

TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA 📋

Instruction Data

Extension Types:

```
▼ [  1 item
   │  0 : "immutableOwner"
   ]
```

Mint:

🪙 MNGO 📋

### #3.3 - System Program: CreateAccount

Raw

Interact With
System Program

11111111111111111111111111111111 ⧉

Instruction Data
New Account:

GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP ⧉  [WRITABLE]

Source:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk ⧉  [WRITABLE] [SIGNER] [FEE PAYER]

Transfer Amount:
**0.00203928** 💠 SOL

Program Owner:
💠 Token Program ⧉  [PROGRAM]

### #3.4 - Token Program: InitializeImmutableOwner

Raw

Interact With
Token Program

TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA ⧉

Instruction Data
Account:

GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP ⧉  [WRITABLE]

### #3.5 - Token Program: InitializeAccount3

Raw

Interact With
Token Program

TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA ⧉

Instruction Data
Token Address:
🍊 MNGO ⧉

Init Account:

GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP ⧉  [WRITABLE]

Owner:

D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt

## #4 - Voter_stake_registry: Deposit                                        Raw

Interact With

Voter_stake_registry

4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo

Input Accounts

#1 - Registrar: 4WQSYg21RrJNYhF4251XFpoy1uYbMHcMfZNLMXA3x5Mp

#2 - Voter: D9VdFDewJty8CDktJkUzCN4kDtme3JPVDngfeY1RBTFt   `WRITABLE`

#3 - Vault: GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP   `WRITABLE`

#4 - Deposit Token: 2FemVU4cUkNiRBuH1SmyX2BdgGbZFA7h8DmkypUU8fDg   `WRITABLE`

#5 - Deposit Authority:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk   `WRITABLE`  `SIGNER`  `FEE PAYER`

#6 - Token Program: 🔗 Token Program   `PROGRAM`

Instruction Data

```
▼ { 2 items
  ▼ depositEntryIndex : { 2 items
      type : "u8"
      data : 0
  }
  ▼ amount : { 2 items
      type : "u64"
      data : "333450822000000"
  }
}
```

Inner Instructions

### #4.1 - Token Program: Transfer                                          Raw

Interact With

Token Program

TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA

Instruction Data

Source:

2FemVU4cUkNiRBuH1SmyX2BdgGbZFA7h8DmkypUU8fDg   `WRITABLE`

Destination:

GEcAUyUQdeHZ6e6arsSsbTy66yG8nN2MVdnwzxe8fWLP  [WRITABLE]

Authority:

FLCNpEJbwYXdu6zmozqRkEyssSiRRYYd58frQ8mXPSUk  [WRITABLE] [SIGNER] [FEE PAYER]

Amount:

**333,450,822** 🍊 **MNGO**

## #5 - Compute Budget: SetComputeUnitPrice                              Raw

Action

**Set 0.05** lamports per compute unit

Interact With

Compute Budget

ComputeBudget111111111111111111111111111111

Instruction Data

```
▼ { 2 items
  ▼ discriminator : { 2 items
      type : "u8"
      data : 3
  }
  ▼ microLamports : { 2 items
      type : "u64"
      data : 45000
  }
}
```

⌃

## Program Logs 📄                                          Hide details ⌃

### #1 Mango Governance instruction

> Program log: VERSION:"3.1.1"

> Program log: GOVERNANCE-INSTRUCTION: CreateTokenOwnerRecord

> Invoking System Program

> Program returned success

> Program Mango Governance consumed 13284 of 800000 compute units

> Program returned success

**#2 Unknown Program (4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo) instruction**

> Program log: Instruction: CreateVoter

> Invoking System Program

> Program returned success

> Invoking System Program

> Program returned success

> Program 4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo consumed 33653 of 786716 compute units

> Program returned success

**#3 Unknown Program (4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo) instruction**

> Program log: Instruction: CreateDepositEntry

> Invoking Associated Token Account Program

> Program log: Create

> Invoking Token Program

> Program log: Instruction: GetAccountDataSize

> Program Token Program consumed 1569 of 731493 compute units

> Program return: TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA pQAAAAAAAA=

> Program returned success

> Invoking System Program

> Program returned success

> Program log: Initialize the associated token account

> Invoking Token Program

> Program log: Instruction: InitializeImmutableOwner

> Program log: Please upgrade to SPL Token 2022 for immutable owner support

> Program Token Program consumed 1405 of 724906 compute units

> Program returned success

> Invoking Token Program

> Program log: Instruction: InitializeAccount3

> Program Token Program consumed 4188 of 721022 compute units

> Program returned success

> Program Associated Token Account Program consumed 20589 of 737085 compute units

> Program returned success

> Program 4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo consumed 48184 of 753063 compute units

> Program returned success

**#4 Unknown Program (4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo) instruction**

> Program log: Instruction: Deposit

> Invoking Token Program

    > Program log: Instruction: Transfer

    > Program Token Program consumed 4645 of 685852 compute units

    > Program returned success

> Program log: Deposited amount 333450822000000 at deposit index 0 with lockup kind None and 0 seconds left

> Program 4Q6WW2ouZ6V3iaNm56MTd5n2tnTm4C5fiH8miFHnAFHo consumed 26341 of 704879 compute units

> Program returned success

**#5 Compute Budget instruction**

> Program returned success



A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

🌊 **Powered by Solana Blockchain**

Solscan @2025   Terms of Service   Privacy Policy   Contact Us   Advertise   Knowledge Base

Donations: D27Dgi...L5EuLK ❤️   Join us: 𝕏 📑

# EXHIBIT 6

Page Vault

| | |
|---|---|
| Document title: | (1) Discord \| "Assign Fraud Claims to Mango Labs" \| Mango Markets |
| Capture URL: | https://discord.com/channels/791995070613159966/1288889729982398588 |
| Page loaded at (UTC): | Wed, 15 Jan 2025 20:38:13 GMT |
| Capture timestamp (UTC): | Wed, 15 Jan 2025 20:39:04 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 6 |
| Capture ID: | jXXqL8LgPHxbvjQyqHtFmR |
| Display Name: | Alexa.Rosenson |

PDF REFERENCE #:    hszqCJe5CKymdLU6nchrjc





Want this server to feel unique? Unlock custom server banners with **2 more boosts.**

Boost This Server

Browse Channels NEW

INFORMATION
- welcome
- announcements
- news
- new-members

CHAT CHANNELS
- mango
- support
- yieldfan
- governance
- governance-for... 2 New
- Assign Fraud Claims to M...
- trading
- memes
- mcaps
- irl
- report-violations
- levels
- gm-alpha

DEVELOPMENT
- dev-discussion
- dev-governance
- dev-mango-v4
- dev-solana
- dev-openbook
- dev-website

TICKETS
- support-tickets

VOICE CHANNELS
- meeting-room-text
- Mango Meetup Stage
- Mango Dev Meetup

Alexa Rose... Online

# Assign Fraud Claims to Mango Labs

governance

September 26, 2024

**daffy** OP 9/26/24, 3:47 PM

Hey all, this is a good place to have discussion on this proposal:
https://dao.mango.markets/dao/MNGO/proposal/Chmsfrpt9oKWoug5ebyaik89y19xynbmPeWFamEEBCUV

It's too long to reproduce in this post but the text of the proposal can also be found here:
https://gist.github.com/dafyddd/a3b4c258b2af14ab6892dbe5aabd1b96 (edited)

Realms

Gist
**Assign Fraud Claims to Mango Labs**
Assign Fraud Claims to Mango Labs. GitHub Gist: instantly share code, notes, and snippets.

GitHub Gist

❤️ 1 🍆 1

Follow

September 28, 2024

**DonDuala** 9/28/24, 4:42 PM

Please see my statement on the matter and consider it when voting

Statement on Mango Participation 9-28-2024.pdf
47.84 KB

**donderper** 9/28/24, 5:36 PM

It would be nice to see this resolved without anymore people getting sued

September 29, 2024

**Maximilian** 9/29/24, 12:45 AM

These accusations are wrong.

We should not reward Mango Labs with more funding or rely on it's contributions going forward, they have so far not met expectations.

The proposal includes full indemnification for Mango Labs, LLC and its officers, something that Daffy has multiple times tried to insert into the SEC & CFTC settlement proposals and had to be removed. After all it is not to the advantage of the DAO, and opens up all token holders to unlimited liability.

This proposal is very expensive, "reasonable costs and fees" can become millions of dollars, Mango Labs has a track record

Send a message in "Assign Fraud Claims to Mango Labs"

This proposal is very expensive, "reasonable costs and fees" can become millions of dollars, Mango Labs has a track record of in-transparency, lack of reporting and wildly overshooting budgets, again it opens up all token holders to unlimited liability.

This proposal, as it is currently stated, has the DAO waiving all rights to receive any recovery. In one sentence, the proposal states that Mango Labs will distribute money, but in the next paragraph, the DAO waives any rights to receive any distribution. Worse, the proposal indemnifies Mango Labs for its expenses - which would include lawyers. So if Mango Labs recovers funds, and chooses not to return money to the DAO, the DAO is in a terrible position. All the DAO could do is sue, but the DAO would be paying for Mango Labs' defense lawyers as well as its own lawyers, and the DAO will have waived its rights, making its legal case weak.

Arguing with threats against impartial positions just shows bad manners. Obviously most people addressed can stay impartial and ignore this. I would still ask everyone to deny this proposal for the aforementioned reasons. (edited)

September 30, 2024

**Adrian** 9/30/24, 2:07 PM
Posting this at my own capacity not as the DAO representative because this dispute is outside of the US regulatory matters

Nothing is black or white.

Unfortunately, Mango DAO has been in legal limbo for almost two years now. I believe this proposal would only drag us into another round of expenses and even more legal complications that everyone would like to move past.

Do I think it's acceptable for someone to profit 2.5 times on such a trade? No.

However, I also don't think any normal company would grant the provisions listed in this proposal to someone. Additionally, if you were to win this dispute and reclaim John's tokens to return them to the DAO, you would become the primary beneficiary. This includes a reasonable fee that isn't specified here, the return of all legal costs related to this, and a higher book value for your personal tokens. Also, what if the dispute is lost?

Engaging in further legal action could drain the DAO's financial and human resources, which could be better allocated to development and growth initiatives. Prolonged legal disputes may also affect the morale and cohesion of our community, potentially hindering progress on important projects.

This proposal should be withdrawn and we should set a deadline until the end of the year for you to try to resolve this among yourselves. If there isn't a reasonable solution by then, we can revisit such a vote. In the meantime, let's focus on moving past legal issues to concentrate on the DAO's long-term objectives and the betterment of the community as a whole. (edited)

❤️ 3    😀

**LegalizeOnionFutures** 9/30/24, 10:42 PM
> This proposal should be withdrawn and we should set a deadline until the end of the year for you to try to resolve this among yourselves. If there isn't a reasonable solution by then, we can revisit such a vote.
The looters have made repeated use of delaying tactics, so as it happens a three-month delay is not a compromise suggestion. Hence why Kramer gave it a heart emoji.
> In the meantime, let's focus on moving past legal issues
How do you move past being run by criminals? This is an active shooter situation, not some historical grievance (edited)

October 1, 2024

↩ @LegalizeOnionFutures > This proposal should be withdrawn and we should set a deadline until the end of the year for you to try to resolv...
**Adrian** 10/1/24, 4:23 AM
I think you don't need any DAO money and any proposals to pursue criminals.

↩ @Adrian I think you don't need any DAO money and any proposals to pursue criminals.
**LegalizeOnionFutures** 10/1/24, 5:50 AM
I have plenty of money already thank you but I don't think that's any of your business

😂 2    😀

↩ @LegalizeOnionFutures I have plenty of money already thank you but I don't think that's any of your business
**Adrian** 10/1/24, 5:51 AM
This is just general assumption not personal one. (edited)

Send a message in "Assign Fraud Claims to Mango Labs"



This is just general assumption not personal one. (edited)

@Adrian This is just general assumption not personal one. (edited)

**LegalizeOnionFutures** 10/1/24, 6:05 AM
How do you suggest removing the criminals from positions of power in the DAO? They're quite close to having an unassailable majority of tokens

👍 1      🙂

October 9, 2024

@DonDuala Please see my statement on the matter and consider it when voting 🖼️

**donderper** 10/9/24, 12:49 PM
You sure were the DAO treasurer even if the job you actually did - tracking the balance sheet, arranging buybacks and managing where the funds went - is different from a standard treasurer role.

How do we know that whoever you bought the tokens from, allegedly for 1.2c according to the lawsuit, didn't think they were interacting with or selling you the tokens in your capacity as DAO treasurer?

**LegalizeOnionFutures** 10/9/24, 6:42 PM
Save Labs has bought SLND tokens from the FTX estate and put up a proposal to sell them to the Solend DAO **at cost**. They disclosed the purchase price too of course.

Will Max and John ever offer an explanation for why they didn't do that and instead forced the DAO to pay an exorbitant premium? https://x.com/save_finance/status/1843971610589745488 (edited)

👍 4      📄 1      🙂

**bingobango** 10/9/24, 11:12 PM
I think the most damning evidence of the alleged fraud is that through the initial "treasury diversification" process, Don believed the only acceptable way to buyback MNGO was by using his "Dual" project's option offering. He believed that buying back at some arbitrary discount to book value would be too "inefficient."

However, after acquiring the FTX estate's MNGO, he quickly changed his tune on "efficient buybacks." Almost immediately after acquiring the estate's MNGO he proposed buying back at a 5% discount to book value, which was like double the market price. Not very efficient, imo.

Either he made a complete 180 in his views, or he was lying to the DAO in an effort to personally gain at the DAO's expense.

I think it's also important to note that there were really only 2 logical explanations for purchasing the estate's MNGO:

1) to sell back to the DAO, as there are no other viable counterparties.

2) to perform a hostile attack on the DAO.

Although I would support legally pursuing for damages to the DAO, etc., ultimately, I think the right answer is for the DAO to buy the MNGO tokens from CKS at the price they were acquired at (less the amount of gain already captured).

*From the DAO's POV:*
The DAO ultimately gets the deal they should have received if the treasury council had upheld their duty, and don't have to pay even more legal bills.

*From CKS' POV:*
CKS gets to wash their hands of any alleged wrongdoing, they get immediate liquidity on an otherwise completely illiquid trade, and they don't have to pay a ton of legal bills. (edited)

@bingobango I think the most damning evidence of the alleged fraud is that through the initial "treasury diversification" process, Don beli...

**Finn | Nethermind** 10/9/24, 11:48 PM
SEC Settlement:

"Should the DAO acquire any MNGO tokens in the future, it shall destroy or otherwise make any of those MNGO tokens unavailable for trading, selling, offering or purchasing within 10 days of receipt."

This is not possible

Send a message in "Assign Fraud Claims to Mango Labs"

This is not possible

**LegalizeOnionFutures** 10/9/24, 11:52 PM
The DAO can acquire tokens, it just has to burn them

👍 2    😊

**Finn | Nethermind** 10/9/24, 11:52 PM
Ah I understand

Simply trying to become more informed here:

Would this not at the end be equivalent to a direct transfer of USDC from CKS to the DAO of the difference?

If expected legal costs of CKS + prob_win * 0 + (1 - prob_win) * gain < gain then there is no incentive.

Depends on the case from CKS perspective - it's not so clear cut. (edited)

October 10, 2024

🌐 @bingobango I think the most damning evidence of the alleged fraud is that through the initial "treasury diversification" process, Don beli...

**donderper** 10/10/24, 6:34 AM
Two questions

- how do we get the proposal set up to do this, to make the offer to buy back tokens at a specific price such that it is executable
- it's embarrassing but it's not clear that there is sufficient internal support for something like this from the @team . Is there sufficient political support from people at mango and other MNGO holders to publicly call out John for his actions now that all the details in the lawsuit are public and encourage him to take a deal that's fair for the DAO? It's unclear whether the whole action was illegal but it was clearly immoral and appears to be tacitly supported by Max as outlined in the suit

(edited)

**LegalizeOnionFutures** 10/10/24, 7:55 AM
There was nothing tacit in Max's support of it lol

@donderper Two questions · how do we get the proposal set up to do this, to make the offer to buy back tokens at a specific price such t...
**bingobango** 10/10/24, 8:05 PM
I think this only works if both Max/John and Daffy agree to go forward with it.

Don't think it should be super complex from an "Xs and Os" standpoint (the transfers are fairly straightforward). The maybe somewhat trickier part is including language to absolve CKS of wrongdoing. The DAO cannot absolve them of any potential criminal charges that could be brought by a government agency, but the DAO can generally agree to not pursue a civil suit.

There was similar language in the Avi agreement, but was generally non-binding as it was agreed by the DAO under duress. A similar "duress" argument could be made here, but it seems unlikely to hold water, as I don't think there's much reason for legitimate concern about CKS draining the treasury, etc.

I am not a lawyer. None of this is legal advice. Just providing my 2c, as it seems like the best path forward for the DAO is through some compromise and both sides seem unwilling to make that first step.

@Finn | Nethermind Simply trying to become more informed here: Would this not at the end be equivalent to a direct transfer of USDC fr...
**bingobango** 10/10/24, 8:18 PM
I guess I haven't done the math on how much of the MNGO CKS purchased has already been sold to the DAO. Is your point that they've already received more from the DAO than their cost basis on the FTX estate tokens?

If they've already received more than their cost basis, I would suggest it ultimately be them sending both the excess USDC and the remaining FTX estate MNGO back to the DAO. However, if they haven't already fully recouped their cost basis, I would suggest that the DAO make them whole by sending USDC as part of the agreement.

I'm not a lawyer, and am just free styling here, but would generally assume that the resolution to this would be an important consideration for any potential criminal case that could be brought against CKS(?). If the outcome is generally the same as that which would have happened if all duties were upheld, I think that would play into the potential judgement. And I don't know how that would ultimately factor into any calculation of EV. (edited)

Send a message in "Assign Fraud Claims to Mango Labs"

Document title: (1) Discord | &quot;Assign Fraud Claims to Mango Labs&quot; | Mango Markets
Capture URL: https://discord.com/channels/791995070613159966/1288889729982398588
Capture timestamp (UTC): Wed, 15 Jan 2025 20:39:04 GMT



**donderper** 10/10/24, 6:34 AM
I think the most damning evidence of the alleged fraud is that through the initial "treasury diversification" process, Don beli...
Two questions

- how do we get the proposal set up to do this, to make the offer to buy back tokens at a specific price such that it is executable
- it's embarrassing but it's not clear that there is sufficient internal support for something like this from the @team . Is there sufficient political support from people at mango and other MNGO holders to publicly call out John for his actions now that all the details in the lawsuit are public and encourage him to take a deal that's fair for the DAO? It's unclear whether the whole action was illegal but it was clearly immoral and appears to be tacitly supported by Max as outlined in the suit

(edited)

**LegalizeOnionFutures** 10/10/24, 7:55 AM
There was nothing tacit in Max's support of it lol

@donderper Two questions • how do we get the proposal set up to do this, to make the offer to buy back tokens at a specific such t...
**bingobango** 10/10/24, 8:05 PM
I think this only works if both Max/John and Daffy agree to go forward with it.

Don't think it should be super complex from an "Xs and Os" standpoint (the transfers are fairly straightforward). The maybe somewhat trickier part is including language to absolve CKS of wrongdoing. The DAO cannot absolve them of any potential criminal charges that could be brought by a government agency, but the DAO can generally agree to not pursue a civil suit.

There was similar language in the Avi agreement, but was generally non-binding as it was agreed to by the DAO under duress. A similar "duress" argument could be made here, but it seems unlikely to hold water, as I don't think there's much reason for legitimate concern about CKS draining the treasury, etc.

I am not a lawyer. None of this is legal advice. Just providing my 2c, as it seems like the best path forward for the DAO is through some compromise and both sides seem unwilling to make that first step.

@Finn | Nethermind Simply trying to become more informed here:  Would this not at the end be equivalent to a direct transfer of USDC fr...
**bingobango** 10/10/24, 8:18 PM
I guess I haven't done the math on how much of the MNGO CKS purchased has already been sold to the DAO. Is your point that they've already received more from the DAO than their cost basis on the FTX estate tokens?

If they've already received more than their cost basis, I guess it would ultimately be them sending both the excess USDC and the remaining FTX estate MNGO back to the DAO. However, if they haven't already fully recouped their cost basis, I would suggest that the DAO make them whole by sending USDC as part of the agreement.

I'm not a lawyer, and am just free styling here, but would generally assume that the resolution to this would be an important consideration for any potential criminal case that could be brought against CKS(?). If the outcome is generally the same as that which would have happened if all duties were upheld, I think that would play into the potential judgement. And I don't know how that would ultimately factor into any calculation of EV. (edited)

💡 1    😊

@bingobango I guess I haven't done the math on how much of the MNGO CKS purchased has already been sold to the DAO. Is your point t...
**Finn | Nethermind** 10/10/24, 10:50 PM
Ah I was simply noting CKS's POV more accurately than you had stated, that their consideration lies in how likely they percieve the case to be won. Thank you for your detailed response!

💯 1    😊

@Finn | Nethermind Ah I was simply noting CKS's POV more accurately than you had stated, that their consideration lies in how likely the...
**bingobango** 10/10/24, 11:53 PM
Ah, fair enough.

I might amend your proposed EV calc to include some component of "probability of successfully selling MNGO back to DAO," as I don't think the odds of getting a friendly deal will be any higher following a protracted legal battle against the DAO, and they've struggled to get the necessary votes as is.

👍 1    😊

Send a message in "Assign Fraud Claims to Mango Labs"

# EXHIBIT 7

1/15/25, 1:50 PM    daffy on X: "Here is the text of the proposal cut into threads for your unwilling to click through: Hello Mango DAO, In April of this year, John …

Case 3:24-cv-01469-CMM    Document 23-1    Filed 02/11/25    Page 83 of 94




**daffy** ✔
@dadadadaffy

← Post

Hello Mango DAO,

In April of this year, John Kramer and Max Schneider committed fraud against the DAO. This activity generated considerable legal exposure for both John and Max. I believe we have strong legal claims to press against them and recover the fraudulently obtained tokens along with additional damages. This is a proposal for the DAO to assign these claims to Mango Labs so that Labs can pursue these claims in court on behalf of the DAO and return the proceeds to the DAO. Labs will cover the cost of this operation up front, but I am asking that the costs be reimbursed if I ultimately prevail where prevailing is defined as any result that saves the DAO money.

Both John and Max have duties to the DAO due to their important status within it. John is the main operator of the treasury council. Max is a cofounder, has his hands in nearly every aspect of the DAO including setting the roadmap, allocating funding, and speaking on behalf of the Mango DAO to outsiders. These important roles within the DAO come with duties to not engage in self-dealing, to not insider trade using their considerable insider knowledge, and to generally act in the best interest of the DAO. Both John and Max violated all of these duties and more.

In addition, John and Max lied via deceptive statements, omitting important facts and simply making outright false statements to me and other DAO members both in public and in private. Max led us to believe he was purchasing the considerable amount of MNGO from the FTX estate on behalf of the DAO. Almost every DAO member who talked to Max regularly over the last year came away believing this. Yet, Max and John bought the tokens for themselves to then dump it onto the DAO at 2.5x market price. Not only is this behavior corrupt and dishonest, it is fraud. The damage to the DAO due to this fraud and corruption is at least $10m not accounting for the loss to our reputation and internal cohesion. While Avi stole from us as an outsider, Max and John defrauded us as insiders. This type of behavior will destroy any organization.

In the interest of brevity, I've decided not to list every single corrupt and unlawful behavior perpetrated by John and Max. Ultimately, I intend to prove these and all other claims in court.

Over the last two years, I've been working on resolving our various regulatory issues and pursuing Avi for the funds he stole from us. On top of this, over the last five months I've had to work on undoing the consequences of the fraud committed by John and Max in such a way that minimizes disruption to other DAO members and our other legal matters. I've made several attempts to resolve this issue in a cooperative manner with John and Max, but my efforts proved fruitless. I believe the best course of action now is to seek justice through the courts.

**New to X?**

Sign up now to get your own personalized timeline!

Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

Retry

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ⋯   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up




reluctance to "get involved" due to fear of reprisals from the treacherous duo. I have three responses to this. One, you are already involved whether you like it or not. The court is likely to force the involvement of anyone who has important knowledge about these matters. Second, you have a duty to stand up to corrupt behavior in any organization you are a part of. Not doing so reflects poorly on you and could follow you around. Third, if you stand up to this corruption, you will find that I and many others in the industry will stand behind you. Unethical behavior of the sort practiced by John and Max will eventually reach the public light but so will your good deeds.

I am open to sharing the draft of the complaint if that will help inform your decision on this proposal. As always, I'm open to any criticism or questions you may have. I will do my best to answer, though, you should keep in mind we are in an adversarial situation and it may not be in the DAO's best interest for me to make public all matters.

9:58 AM · Sep 26, 2024 · **12.2K** Views

💬 4          🔁 5          ♡ 37          🔖 3          ⬆

---

### New to X?

Sign up now to get your own personalized timeline!

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

---

Something went wrong. Try reloading.

Retry

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up

# EXHIBIT 8

   

< Back 

# Assign Fraud Claims to Mango Labs

Defeated

Proposed by: 2CCTKAY6AVctbfDrU5WZWSXUfTuFWC3wKW8ZJkvdSqCL

Hello Mango DAO,

In April of this year, John Kramer and Max Schneider committed fraud against the DAO. This activity generated considerable legal exposure for both John and Max. I believe we have strong legal claims to press against them and recover the fraudulently obtained tokens along with additional damages. This is a proposal for the DAO to assign these claims to Mango Labs so that Labs can pursue these claims in court on behalf of the DAO and return the proceeds to the DAO. Labs will cover the cost of this operation up front, but I am asking that the costs be reimbursed if I ultimately prevail where prevailing is defined as any result that saves the DAO money.

Both John and Max have duties to the DAO due to their important status within it. John is the main operator of the treasury council. Max is a cofounder, has his hands in nearly every aspect of the DAO including setting the roadmap, allocating funding and speaking on behalf of the Mango DAO to outsiders. These important roles within the DAO come with duties to not engage in self-dealing, to not insider trade using their considerable insider knowledge, and to generally act in the best interest of the DAO. Both John and Max violated all of these duties and more.

In addition, John and Max lied via deceptive statements, omitting important facts and simply making outright false statements to me and other DAO members both in public and in private. Max led us to believe he was purchasing the considerable amount of MNGO from the FTX estate on behalf of the DAO. Almost every DAO member who talked to Max regularly over the last year came away believing this. Yet, Max and John bought the tokens for themselves to then dump it onto the DAO at 2.5x market price. Not only is this behavior corrupt and dishonest, it is fraud. The damage to the DAO due to this fraud and corruption is *at least* $10m not accounting for the loss to our reputation and internal cohesion. While Avi stole from us as an outsider, Max and John defrauded us as insiders. This type of behavior will destroy any organization.

In the interest of brevity, I've decided not to list every single corrupt and unlawful behavior perpetrated by John and Max. Ultimately, I intend to prove these and all other claims in court.

Over the last two years, I've been working on resolving our various regulatory issues and pursuing Avi for the funds he stole from us. On top of this, over the last five months I've had to work on undoing the consequences of the fraud committed by John and Max in such a way that minimizes disruption to other DAO members and our other legal matters. I've made several attempts to resolve this issue in a cooperative manner with John and Max, but my efforts proved fruitless. I believe the best course of action now is to seek justice through the courts.

Many of you have expressed to me in private that you find Max and John's behavior corrupt and immoral. Most of you have also expressed a reluctance to "get involved" due to fear of reprisals from the treacherous duo. I have three responses to this. One, you are already involved whether you like it or not. The court is likely to force the involvement of anyone who has important knowledge about these matters. Second, you have a duty to stand up to corrupt behavior in any organization you are a part of. Not doing so reflects poorly on you and could follow you around. Third, if you stand up to this corruption, you will find that I and many others in the industry will stand behind you. Unethical behavior of the sort practiced by John and Max will eventually reach the public light but so will your good deeds.

I am open to sharing the draft of the complaint if that will help inform your decision on this proposal. As always, I'm open to any criticism or questions you may have. I will do my best to answer, though, you should keep in mind we are in an adversarial situation and it may not be in the DAO's best interest for me to make public all matters. Below, you'll find the technical language to assign the claims.

## ASSIGNMENT OF CLAIMS FROM MANGO DAO AND ITS MEMBERS TO MANGO LABS, LLC

The Mango Decentralized Autonomous Organization and its individual members ("Mango DAO"), hereby transfers their rights and claims against Maximillian Schneider and John Kramer arising from and related to their fraud and misrepresentation regarding the MNGO tokens they purchased from FTX.

Mango DAO also transfers all rights, claims, and defenses against any third parties whose conduct, whether by negligence or otherwise, enabled the harm caused by Kramer and Schneider.

Mango DAO and Mango Labs, LLC agree that Mango Labs will provide services to Mango DAO to enforce the assigned claims as necessary through legal action in applicable jurisdictions. Upon recovery of assets, Mango Labs will return proceeds, after reasonable costs and fees, to Mango DAO. Mango DAO agrees to reimburse and indemnify Mango Labs, LLC and its officers for any reasonable costs and claims relating to this action.

Through this agreement, Mango DAO hereby irrevocably conveys, transfers and assigns to Mango Labs, LLC all rights, titles, and interests in, to and under all claims arising out of or related to the dispute. These include, without limitation, all causes of action or other rights with respect to such claims, all rights to receive any amounts or property or other distribution in respect of or in connection with such claims, and any and all proceeds of any of the foregoing (including proceeds of proceeds). This release constitutes an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law.

By passage of the vote, Mango DAO manifests assent and agreement to be bound by this assignment.

## Results

**The proposal has failed**

❌ 0 more Yes vote were needed

Yes Votes                                                                No Votes
446,502,389                                                    455,098,744
49.5%                                                                        50.5%

Explore ›

## Voting Rules

👥 Community        🕐 4d        ⚖ 2%        ⚖ Disabled

## Discussion (0)

Thoughts?...

**Send It**

 

© 2024 Realms Today Ltd  |  Terms  |  Privacy Policy

Read the Docs

Powered by Solana

# EXHIBIT 9

**Page Vault**

| | |
|---|---|
| Document title: | (1) daffy on X: "Here is the text of the proposal for those of you unwilling to click through: Hello Mango DAO, In April of this year, John Kramer and Max Schneider committed fraud against the DAO. This activity generated considerable legal exposure for both John and Max. I believe we have" / X |
| Capture URL: | https://x.com/dadadadaffy/status/1839333614783180808 |
| Page loaded at (UTC): | Tue, 11 Feb 2025 22:20:08 GMT |
| Capture timestamp (UTC): | Tue, 11 Feb 2025 22:26:53 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 5 |
| Capture ID: | 3yu3WnLY1nHacHTuNYtKJy |
| Display Name: | Alexa.Rosenson |





X
Home
Explore
Notifications
Messages
Grok
Lists
Bookmarks
Jobs
Communities
Premium
Verified Orgs
Profile
More
Post
luvsportsgirl3212
@luvsportsg73037

Post Reply

In the interest of brevity, I've decided not to list every single ...
Ultimately, I intend to prove these and all other claims in court.

Over the last two years, I've been working on resolving our various regulatory issues and pursuing Avi for the funds he stole from us. On top of this, over the last five months I've had to work on undoing the consequences of the fraud committed by John and Max in such a way that minimizes disruption to other DAO members and our other legal matters. I've made several attempts to resolve this issue in a cooperative manner with John and Max, but my efforts proved fruitless. I believe the best course of action now is to seek justice through the courts.

Many of you have expressed to me in private that you find Max and John's behavior corrupt and immoral. Most of you have also expressed a reluctance to "get involved" due to fear of reprisals from the treacherous duo. I have three responses to this. One, you are already involved whether you like it or not. The court is likely to force the involvement of anyone who has important knowledge about these matters. Second, you have a duty to stand up to corrupt behavior in any organization you are a part of. Not doing so reflects poorly on you and could follow you around. Third, if you stand up to this corruption, you will find that I and many others in the industry will stand behind you. Unethical behavior of the sort practiced by John and Max will eventually reach the public light but so will your good deeds.

I am open to sharing the draft of the complaint if that will help inform your decision on this proposal. As always, I'm open to any criticism or questions you may have. I will do my best to answer, though, you should keep in mind we are in an adversarial situation and it may not be in the DAO's best interest for me to make public all matters.

3:58 PM · Sep 26, 2024 · **12.2K** Views

4 5 37 3

Post your reply Reply

**daffy** @dadadadaffy · Sep 26, 2024
Here is a useful tweet thread produced in May which summarizes some of the evidence

**Kevin** @dj_d_sol · May 2, 2024
Who is looting the Mango DAO?

Who is the mystery FTX buyer Max refuses to talk about? Why don't Max and his cronies care?🧵
...
Show more

Search

**Relevant people**
daffy @dadadadaffy Follow
poasting under gun point

**Get paid to post**
Enjoy posting on X? Subscribe to Premium to join our revenue share program.
Subscribe

**What's happening**
Manchester City vs Real Madrid
30 minutes ago
Sports · Trending
Real Madrid
Trending with Vini, Mbappe
342K posts
Music · Trending
#Sanremo2025
354K posts
Politics · Trending
F Trump
31K posts
Sports · Trending
Guardiola
34.6K posts
Show more

Terms of Service Privacy Policy Cookie Policy
Accessibility Ads info More ...
© 2025 X Corp.

Home
Explore
Notifications
Messages
Grok
Lists
Bookmarks
Jobs
Communities
Premium
Verified Orgs
Profile
More

Post

1 1 10 3.9K

**daffy** @dadadadaffy · Sep 26, 2024
Here is the link to the updated DAO proposal which now includes the technical language to assign claims:
dao.mango.markets/dao/MNGO/propo...

1 1 7 3.9K

**daffy** @dadadadaffy · Sep 30, 2024
Here's Mango Labs' response to CKS' claims for "accountability" from Labs. John and Max know most of what is in this post, but they're cynically grasping at straws so they can continue in their smash and grab scheme. This is not new, I've been dealing with this for several months
Show more

2 3 11 3.8K

**daffy** @dadadadaffy · Sep 30, 2024
This conflict is likely to be ongoing for a while with many new proposals created by CKS. If you know me and trust me to handle this issue with integrity on behalf of the Mango DAO, please consider delegating your vote to my wallet:
2CCTKAY6AVctbfDrU5WZWSXUfTuFWC3wKW8ZJkvdSqCL
Show more

4 9 2.2K

**Slurix** @slurix_xyz · Sep 26, 2024
@DeTards

278

**Frank Ronson** @PoGoFrankR · Oct 10, 2024
I can hear @lex_node screaming at his computer screen reading this

1 1 47

Show additional replies, including those that may contain offensive content Show

**luvsportsgirl3212**
@luvsportsg73037

Search

## Relevant people

**daffy** @dadadadaffy Follow
poasting under gun point

## Get paid to post

Enjoy posting on X? Subscribe to Premium to join our revenue share program.

Subscribe

## What's happening

**Manchester City vs Real Madrid**
30 minutes ago

Sports · Trending
**Real Madrid**
Trending with Vini, Mbappe
342K posts

Music · Trending
**#Sanremo2025**
354K posts

Politics · Trending
**F Trump**
31K posts

Sports · Trending
**Guardiola**
34.6K posts

Show more

Terms of Service Privacy Policy Cookie Policy Accessibility Ads info More ···
© 2025 X Corp.

Post Reply

Search

Home
Explore
Notifications
Messages
Grok
Lists
Bookmarks
Jobs
Communities
Premium
Verified Orgs
Profile
More

Post

Show additional replies, including those that may contain offensive content
Show

**Relevant people**

**daffy** @dadadadaffy Follow
poasting under gun point

**Get paid to post**
Enjoy posting on X? Subscribe to Premium to join our revenue share program.
Subscribe

**What's happening**

**Manchester City vs Real Madrid**
30 minutes ago

Sports · Trending
**Real Madrid**
Trending with Vini, Mbappe
342K posts

Music · Trending
**#Sanremo2025**
354K posts

Politics · Trending
**F Trump**
31K posts

Sports · Trending
**Guardiola**
34.6K posts

Show more

Terms of Service Privacy Policy Cookie Policy Accessibility Ads info More ···
© 2025 X Corp.

**luvsportsgirl3212**
@luvsportsg73037



